George P. SHULTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

AMERICAN CAN COMPANY—DIXIE PRODUCTS, a Corporation, Appellee.

No. 19581.

United States Court of Appeals, Eighth Circuit.

March 30, 1970.

Bessie Margolin, Associate Sol., for appellant; Harold C. Nystrom, Acting Solicitor of Labor and attorneys Robert E. Nagle and Helen W. Judd, U. S. Department of Labor, Washington, D. C., and Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Atlanta, Ga., were on the brief with Miss Margolin. L. H. Silberman, Solicitor of Labor, and at-

torneys Carin Ann Clauss and Helen W. Judd, U. S. Dept. of Labor, Washington, D. C., and Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Atlanta, Ga., were on the reply brief with Miss Margolin.

Edgar E. Bethell, of Bethell, Stocks, Callaway & King, Fort Smith, Ark., for appellee and filed brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

We are confronted here with a narrow but important question arising out of the administration of the Equal Pay Act of 1963, 29 U.S.C.A. § 206(d) (1). Is the American Can Company discriminating against its female machine operators, who work exclusively on the AM-PM shifts, by paying operators on those shifts twenty cents an hour [1] less than males operating identical machines on the night shift?

The Equal Pay Act prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees * * * at a rate less than the rate at which he pays wages to employees of the opposite sex * * * for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to * * * (iv) a differential based on any other factor other than sex. * * *".

The principal task of all operators is to tend the machines to which they are assigned. All are charged with the responsibility of producing sanitary, seamproof, perfectly formed, printed cups and containers. All must keep their machines clean, observe them for malfunctions, clear jams and perform minor adjustments. All are required to maintain the proper supply of glue and other chemicals in the dispensers, thread the machines with paper and perform certain inspection and packing tasks. All are required to remain at their machines unless replaced by a relief operator. But the night shift operators usually perform one task that is not performed by the operators on the AM-PM shifts. They load thier machines with heavy rolls of paper.[2] "Roll boys" or maintenance men perform this task on the AM-PM shifts. While the machines differ in rates of paper usage and in paper storage capacity, the time spent on the paper handling and loading tasks by the night shift operators varies between seven and thirty-three minutes per eight-hour shift depending on the type of machine operated.

The machines using rolls of paper are designed to store more than one roll. The rolls stored in the machine are changed by all operators by merely pulling a lever and then threading the paper through the machine. When the machine is out of paper, rolls of paper weighing between fifty and one thousand pounds must be transported a few feet and loaded into the machines. The heavier rolls are loaded with the aid of a hydraulic lift, while the smaller rolls must be manually lifted onto spindles located close to the floor.

The wage differential between AM-PM and night shift operators is a historical one. When the plant was first opened, the first and second shifts comprised one department known as the AM-PM Shift Department, and the third shift comprised the Night Shift Department.

---

1. This twenty cents an hour pay differential is exclusive of "shift premium" paid to all employees' on the PM and night shifts. No issue is raised as to the propriety or legality of these "shift premiums."

2. In addition to the five machines which use rolls of paper, two machines use pre-cut paper blanks. All operators load the actual blanks into their machines, but the night shift operators usually obtain their own supply of blanks while this task was performed by utility or maintenance men on the AM–PM shifts. The containers for these blanks weigh up to fifteen hundred pounds but tend to last for longer periods of time than do the rolls.

Each department utilized the same machines but had separate seniority and separate job progression scales. Employment as an operator on the AM-PM shifts was specifically limited to women and employment on the night shift was specifically limited to men.

In October of 1965, the Company and Local 656, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, representing the employees, entered into an agreement which purported to abolish the wage differential based on sex for all positions within the plant.[3] The agreement expressly opened the night shift to women and the day shift to men but retained the wage differential between AM-PM operators and night operators at the then seventeen cents per hour. In January of 1966, the Union and the Company issued an interpretation of the amended collective bargaining agreement. The interpretation stated that in the event of a reduction in force, men would be permitted to "bump" AM-PM shift employees with less seniority. It gave a similar privilege to AM-PM employees. The AM-PM employees, however, were required to demonstrate, during a forty-five day trial period, that they could do all of the work required on the night shift, including loading the machines with paper. Transferring employees were to be paid the hourly rate applicable to the job to which they transferred. Five men had transferred to the AM-PM shifts when this case was tried in 1968. A few women had requested to be assigned to the night shift but, for reasons not material herein, their requests have not been granted.

The trial court concluded, on the basis of the above facts, that (1) the Company had ceased discriminating on June 10, 1965, by opening the AM-PM shifts to men and the night shift to women; (2) the work was not equal because the night shift operators exerted effort not required of AM-PM operators by loading the machines; and (3) even if the work is equal, the twenty cents per hour differential is justified by the fact that the Company obtains its maintenance personnel by promotion from the night shift operator classification.

■ At the outset, we think it clear that the Company did not cure the alleged violation of the Equal Pay Act by agreeing to open the night shift to women. If in fact the work of the women was equal to that of the men, the Company became obligated to pay them the same scale as their male counterparts on the effective date of the Act, June 11, 1965. It could not relieve itself of that obligation by agreeing to allow some women to work on the night shift at a higher rate of pay at some future date when a vacancy occurred. Compare, United States v. Sheet Metal Workers Int'l Assoc., 416 F.2d 123 (8th Cir. 1969). Nor could it achieve compliance by opening the AM-PM shifts to men at the lower rate. The statute expressly forecloses that possibility by providing that "an employer who is paying a wage rate differential in violation [of the Act] shall not, in order to comply with the provisions [of the Act] reduce the wage rate of any employee." 29 U.S.C.A. § 206(d) (1).[4]

The second and primary question is whether an equal effort was required of all operators.[5]

---

3. While the issue was in dispute, the lower court found that discrimination based on sex was terminated by the appellee in June, 1965. In our view of the case, it is unnecessary for us to determine the correctness of that finding.

4. The legislative history appears to be clear on this point. For example, the House Report stated: "The lower wage rate must be increased to the level of the higher." 109 Cong.Rec. 9210 (1963).

Representative Thompson stated that the " * * * lower wage rate must be increased to the higher level so that there will not be an adverse effect on already established wage patterns." 109 Cong. Rec. 9196 (1963).

5. No question is raised as to the equality of the operators' skill and responsibility or as to the similarity of their working conditions.

In answering this question, we recognize (1) that the burden of proving that given jobs require equal effort rests with the Secretary, (2) that we are bound to accept the trial court's findings of fact unless they are clearly erroneous, but that we are not required to accept its conclusions in accordance with that standard,[6] and (3) that Congress, in using the terms "equal work" and "equal effort," did not intend to require that jobs be identical to be equal but intended only that they require the same effort, skill and responsibility.

"* * * Congress in prescribing 'equal' work did not require that the jobs be identical, but only that they must be substantially equal. Any other interpretation would destroy the remedial purposes of the Act.

"The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it."

Shultz v. Wheaton Glass Co., 421 F.2d 259 (3rd Cir. 1970); 29 C.F.R. §§ 800.120, 800.122, 800.127. We believe that any other interpretation would limit the broad remedial purposes of the statute which were the elimination of discrimination and the raising of the level of women's wages.[7]

In our view, the Secretary sustained the burden of proving that all operators' jobs are equal within the meaning of the Act: (1) The handling and loading functions of the night shift operators, while performed regularly, are minor and incidental. They do not involve the exertion of substantial additional effort. Most of the physical and mental effort exerted in the performance of the job is related to the operation of the machines. Compare, Wirtz v. Koller Craft Plastic Products, Inc., 58 L.C. ¶ 32,076 (E.D.Mo.1968); Wirtz v. Rainbo Baking Co., 54 L.C. ¶ 31,884 (E.D.Ky. 1967). Night shift operators spend only two to seven percent of their time handling and loading paper and from ninety-three to ninety-eight percent of their time operating their machines. See, Norman v. Missouri Pacific Railroad, 414 F.2d 73, n. 4 (8th Cir. 1969); Howard v. St. Louis-San Francisco Ry. Co., 191 F.2d 442 (8th Cir. 1951), aff'd sub nom., Brotherhood of R.T. v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952). (2) No wage differential

6. The appellee contends that we must test the District Court's finding that the work was not equal by the "clearly erroneous" rule, Fed.R.Civ.P. 52(a). We disagree. Rule 52(a) requires that we accept the trial court's findings of fact, e. g., the time required to load the machines with paper and the weight of the rolls of paper handled, unless these findings are clearly erroneous. But it does not require that we apply that standard in testing the validity of the conclusion drawn from the found facts. Such inquiry is not within the scope of the clearly erroneous standard. See, Baumgartner v. United States, 322 U.S. 665, 670–671, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); Shultz v. Wheaton Glass Co., 421 F.2d 259 (3rd Cir. 1970); Wirtz v. Barnes Grocer Company, 398 F.2d 718, 722 (8th Cir. 1968).

7. The broad remedial purposes of the Act are set out in Section 2 of the statute:
"(a) The Congress hereby finds that the existence in industries engaged in commerce or in the production of goods for commerce of wage differentials based on sex—
"(1) depresses wages and living standards for employees necessary for their health and efficiency;
"(2) prevents the maximum utilization of the available labor resources;
"(3) tends to cause labor disputes, thereby burdening, affecting, and obstructing commerce;
"(4) burdens commerce and the free flow of goods in commerce; and
"(5) constitutes an unfair method of competition.
"(b) It is hereby declared to be the policy of this Act, through exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct the conditions above referred to in such industries."
Pub.L.No. 88–38, § 2, 77 Stat. 56.

exists as between night shift operators even though they are not all required to exert identical effort. All night shift operators receive the same rate of pay whether they spend a few minutes or thirty-three minutes per shift in the handling and loading function, whether the rolls of paper weigh fifty or fifteen hundred pounds, whether the rolls are loaded manually or mechanically, see 29 C.F.R. §§ 800.122(a) and 800.128, or whether they perform the job alone or with the assistance of the maintenance adjusters who work with them on the night shift.[8] (3) No question of skill or responsibility is involved. The paper handling task is performed on the AM and PM shifts by unskilled workers receiving about fourteen cents per hour less than the female machine operators.[9] (4) The wage differential was initially, at least in part, based on sex. This factor, while not a controlling one, is some indication of the Company's view of the job uninhibited by the passage of the Equal Pay Act. (5) The wage differential is not the product of a bona fide job classification system. See, H.R.Rep. 309, May 20, 1963.

The District Court cited Wirtz v. Wheaton Glass Co., 284 F.Supp. 23 (D. N.J.1968), and Wirtz v. Dennison Manufacturing Co., 265 F.Supp. 787 (D.Mass. 1967), as being factually similar to this case and supportive of its view that, here, the work was not equal. *Wheaton* was reversed by the United States Court of Appeals for the Third Circuit, Shultz v. Wheaton Glass Co., *supra*, and is precedent for the result reached by this Court. *Dennison* can be distinguished.

The Dennison Manufacturing Company produced labels, tags and related products. It operated three shifts in the department responsible for attaching wire or string to the tags. The two daytime shifts operated with twenty-one and ten women operators, respectively, at the machines. The two daytime shifts also each utilized two male adjusters whose job it was to provide the heavy materials for the machines, set the machines up to run, repair the machines and generally supervise the operations. These adjusters were paid approximately fifty cents to a dollar per hour more than the female machine operators. Employment on the night shift varied between two and five male operators. The operators did all the work of the adjusters and, in addition, worked without supervision for most of the shift. They were paid five to thirty-one cents per hour more than the female day shift operators. They spent about ten percent of their time in performing their nonoperating duties. The trial court applied the test of substantiality and found that the night operators were required to possess and exercise a significant degree of mechanical skill, exert substantial effort in handling materials, and work without supervision.

8. The lower court found:
   " \* \* \* [T]he evidence established that there is considerable movement of operating employees from one [machine] to another \* \* \*."
   This finding is subject to the clearly erroneous standard. However, none of the evidence by the operators indicated any substantial amount of movement. We find no substantial evidentiary support for this finding. See, Geer-Melkus Construction Co. v. United States, 302 F.2d 181 (8th Cir. 1962).

9. The relevant pay rates in effect in appellee's Fort Smith Plant on October 1, 1968, were:

| | |
|---|---|
| Cup Machine Operator (Night Shift) | $2.64 |
| Cup Machine Operator (AM–PM Shifts) | $2.44 |
| Utility Man (All Shifts) | $2.30 |
| Maintenance Adjuster (All Shifts) | $2.85 |
| Maintenance Mechanic (All Shifts) | $3.01 |

These figures do not include any "shift premiums." See, n. 1, *supra*. The wages to Cup Machine Operators have been adjusted to include an average production bonus of $ .30 per hour which is the amount paid to relief operators in lieu of the production bonus.

It concluded that the work of the male and female workers was not equal.

We, of course, are not faced with the problem of affirming or reversing *Dennison* here. But the case is, in any event, distinguishable on the grounds that the night operators in *Dennison* were required to perform skilled maintenance work without supervision.

█ Finally, we are unable to sustain the trial court's conclusion that the Company sustained its burden [10] of proving that the wage differential is based on a factor other than sex, because the Company regularly promotes night shift operators to maintenance classifications.

While the evidence does indicate that most of the employees in the maintenance classification progress to that position through the night shift operator classification, there is no showing that the night shift operators are required to perform any maintenance task not required of the AM-PM shift operators. In fact, neither male nor female operators perform maintenance work on the machines operated by them. They are simply too busy to do so. The Company has no bona fide "training program," see, 29 C.F.R. § 800.148, to train night shift operators, whether male or female, for maintenance responsibility. All operators have an equal opportunity to gain an understanding of the maintenance problems by operating their machines. Furthermore, men hired as operators are not required to demonstrate greater mechanical ability than women hired for the same positions. Finally, all maintenance men go through the same training program, whether promoted or hired off the street.

The appellee's reliance on Wirtz v. First Victoria Natl. Bank, 58 L.C. ¶ 32,074 (S.D.Tex.1968), and Wirtz v. Citizens First National Bank, 58 L.C. ¶ 32,050 (E.D.Tex.1968), is misplaced. The former was reversed in Shultz v. First Victoria Natl. Bank, 420 F.2d 648 (5th Cir. 1969), and the latter arising in the same Circuit would appear to be controlled by the same opinion.

The Court, in *First Victoria,* dealt with pay differentials between male and female bank employees. The alleged justification for the differential was an informal, unwritten bank officer training program which provided rotation for the trainee through the various departments of the banks. The Court found that the rotation of the male "trainees" to be indistinguishable from the normal course of employment for the female employees. Answering the defendants' contention that this arrangement provided justification for the pay difference, the Court stated:

" * * * In this sense every job in every type of business would be training. * * *

* * * * * *

"Moreover, such imprecise programs are outside the scope of the broad statutory exception—'a factor other than sex' * * * because they are not in harmony with the Congressional purpose: The elimination of those subjective assumptions and traditional stereotyped misconceptions regarding the value of women's work. These programs are inconsistent since in actual operation the work and role of the male employees—'trainees'—cannot be distinguished from the female workers. * * * "

*Id.* at 656.

The judgment of the District Court is reversed with directions to enter an appropriate judgment in favor of the plaintiff.

10. The great weight of authority supports our view that the defendant must bear the burden of proving that he comes within an exception to the Act. See, Shultz v. Wheaton Glass Co., *supra*; Shultz v. First Victoria Natl. Bank, 420 F.2d 648, n. 8 (5th Cir. 1969) ; Wirtz v. Basic, Inc., 256 F.Supp. 786 (D.Nev.1966) ; 29 C.F.R. § 800.141. See also, *e. g.,* Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960) ; Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). But see, Kilpatrick v. Sweet, 262 F.Supp. 561 (M.D.Fla.1967) ; 109 Cong.Rec. 9208 (1963) (remarks by Congressman Griffin).