Marian CHRISTOPHER, Appellant,

v.

The STATE OF IOWA et al., Appellees.

No. 76–1632.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 16, 1977.

Decided July 29, 1977.

David J. Dutton, Waterloo, Iowa, for appellant.

Wallace B. Reed, argued, and John W. Sabbath, Cedar Falls, Iowa, and Richard C. Turner, Atty. Gen., Des Moines, Iowa, on brief, for appellees.

Lois G. Williams, Atty., U. S. Dept. of Labor, argued, and Carin Ann Clauss, Associate Sol. and Alfred G. Albert, Acting Sol. of Labor, Washington, D.C., on brief, for amicus curiae, Secretary of Labor.

Before LAY and WEBSTER, Circuit Judges, and SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

In this case Marian Christopher (hereafter plaintiff) was employed with the job title of Supervisor of the Chemistry Department Stockroom at the University of Northern Iowa, Cedar Falls, Iowa. The University, a defendant, herein,[1] is an educational institution owned by defendant State of Iowa and governed by defendant State Board of Regents.[2] Kenneth Nieman (hereafter Nieman) was employed by the University with the job title of Supervisor of the Central Stores Stockroom.[3] Plaintiff asserts that she performed work equal to that of Nieman, yet he received a higher rate of pay. She seeks back pay, liquidated damages, attorney's fees, and injunctive relief for alleged violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d). The case was tried to the court, which held for defendants. We affirm.

The Act allegedly violated prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees * * * at a rate less

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The State of Iowa and the State Board of Regents are also defendants herein.

2. See Iowa Code § 262.7.

3. Nieman became Supervisor of the Central Stores Stockroom on or about July 1, 1974. Prior to that time, his job title was Receiving Clerk for the Central Stores Stockroom.

than the rate at which he pays wages to employees of the opposite sex * * * for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to * * * (iv) a differential based on any other factor than sex * * *."[4] It is the contention of the plaintiff that her work and Nieman's "are substantially equal in terms of skill, effort, responsibility and working conditions."

The purposes of the Act are remedial in nature. As we held in *Peltier v. City of Fargo*, 533 F.2d 374, 377 (8th Cir. 1976):

> The policy behind the Equal Pay Act was well expressed by the Third Circuit in *Shultz v. Wheaton Glass Company*, 421 F.2d 259, 265 (3rd Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), and has been endorsed by this Circuit in *Shultz v. American Can Company—Dixie Products*, 424 F.2d 356, 360 (8th Cir. 1970). The Third Circuit said:
>
> > Congress in prescribing "equal" work did not require that the jobs be identical, but only that they must be substantially equal. Any other interpretation would destroy the remedial purposes of the Act.
> >
> > The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it. [Footnotes omitted.]
>
> *Shultz v. Wheaton Glass Company, supra*, 421 F.2d at 265.

█ It is to be noted at the outset that the consideration of equal pay standards is based on actual job requirements and performance, and not on job classification or titles.[5]

Nieman's work, as actually performed, involved various duties and responsibilities, extending campus-wide. It was his duty to order a wide variety of basic operational supplies for numerous buildings and departments of the University, either on the basis of needs anticipated from his previous experience, or upon specific requests from various departments. It was his responsibility to prepare proper purchase orders, entailing the recording of substantial detail.[6] His duties included also the upkeep of inventory with new products and alterations of the old, with due regard to current prices, requiring his actual meetings with many salesmen, the record indicating more than 100 annually.[7]

Such supplies having been so ordered, it was the responsibility of the Central Stores Stockroom to receive them. In fact, Central Stores received all of the campus freight shipments (save food items), including supplies ordered by the Chemistry Department. These were checked for damage, and, for quantity, against shipping manifests, complete records thereof being main-

---

4. 29 U.S.C. § 206(d)(1).

5. *Peltier v. City of Fargo, supra; Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 285 (4th Cir. 1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975); *Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 227 (7th Cir. 1972). *See also* 29 C.F.R. § 800.121. The regulations published by the Secretary of Labor on the interpretation of the Equal Pay Act are found at 29 C.F.R. Part 800. While these regulations are not binding on the courts, *Brennan v. City Stores, Inc.*, 479 F.2d 235, 239–40 (5th Cir. 1973), they nevertheless should be given great weight, *Hodgson v. Security National Bank*, 460 F.2d 57, 59 (8th Cir. 1972).

6. These order forms were then forwarded to the University purchasing agent, who placed the order with the supplier.

7. Salesmen who are put on the "bid list" are notified, and "when the quotes come in, they come to me [Nieman] and I go over them and I either take the lowest bid, or many times the lowest bid doesn't always get it. It may be they are bidding something different, trying to send in a sub on us." After the submission of samples in such cases, Nieman takes the samples "over to Don Boss, who is our Purchasing Agent, and [may] say, 'We prefer not to take the lowest bid because one of their products is inferior,' and then he [Boss] will say, 'Okay.' And it goes through that way." Deposition testimony of Mr. Nieman.

tained. When damaged goods were discovered, it was Nieman's responsibility to call the freight company's adjuster and together with him to fill out the damage claim. When other departments of the University discovered concealed damage in the freight they received from Central Stores, they would contact Nieman.

The freight load here involved was substantial, an average of six large truckloads per day. The supplies so received were then delivered to other stockrooms on the campus or to the ultimate users, if necessary by motor vehicles, or were placed in the Central Stores Stockroom by employees thereof. Heavy supplies required the use of a motorized forklift, which Nieman himself operated on the average of a half-hour per day. In addition to such shipments, Central Stores received daily from United Parcel Service some 40 to 50 items, which items[8] were also delivered by Central Stores to the consignees thereof.

Particular items needed quickly, and obtainable locally, were also requested of, obtained, and delivered by Nieman; such incidents occurring two or three times per week.

As to employees, after approximately July 1, 1974, two full-time and two part-time men were employed by Central Stores in addition to Nieman,[9] who was their immediate supervisor and responsible for their work, as well as their grievances. Nieman also had under his direction the physical facilities located in two sizeable rooms of the Shops Building, as well as storage areas in other buildings on the campus.

The plaintiff, on the other hand, was the Supervisor of the Chemistry Department Stockroom;[10] her duties, as found by the trial court, being principally concerned with the Chemistry Department alone.[11] In this limited area her duties and responsibilities were similar to those of Mr. Nieman. She met with a limited number of salesmen concerning new products and changes in contents and prices of old ones. After the receipt of chemical supplies by Central Stores, she became the Chemistry Department's recipient and custodian thereof. In such capacity she checked them against the shipping list, maintaining records of materials processed through her storeroom. If she discovered breakage which appeared to be caused by the shipper, she would call Nieman, who, as noted *supra,* would then contact the freight company's adjuster. With respect to defects not the result of mishandling by the shipper, she would herself contact the supplier of the product in question.

Such of the chemicals and equipment as were required for teaching purposes, she distributed, with the aid of students,[12] to the eight chemistry laboratories. She also

8. Apparently some of these items were ordered by students, rather than by the University itself.

9. Prior to approximately July 1, 1974, only one other full-time man was employed by Central Stores, and Nieman's job entailed substantially more physical effort. Nieman testified that prior to July 1974 he spent about two hours per day unloading freight, whereas after that time he spent only about a half-hour per day unloading freight.

10. The record indicates the use on the campus of five stockrooms: Chemistry, Central Stores, Campus Inventory, Industrial Arts Technology, and Dining/Food Services.

11. From the testimony of plaintiff:
Q What would you say is your primary duty or responsibility as the supervisor of the chemistry stockroom?

A Well, I don't think there is any one prime thing. I think that the managing of the labs and the stockroom, checking the stockroom is probably the main feature.
Q That is where you actually deliver the equipment and supplies to the people using them for the chemistry courses?
A Yes.
While we note that plaintiff had some contact with a small number of other University departments which required chemicals and chemical equipment, we note that such contact was incidental to plaintiff's Chemistry Department responsibilities.

12. Between 15 and 20 students (16 at the time of trial) were employed by the Chemistry Department as lab assistants on a part-time basis. These students were supervised primarily by plaintiff, who was responsible for submitting evaluation forms on each of her assistants to the Chairman of the Chemistry Department.

distributed chemicals and supplies directly to the chemistry professors. She was responsible for and used no motor vehicles in such distribution, nor did she utilize full-time employees. At the end of the semester she checked the equipment supplied to the students for breakage, and appropriate billing records were kept thereof.

It was the conclusion of the trial court, on the basis of the above facts, that "[p]laintiff has failed to establish by a preponderance of the evidence that defendant employers have paid her at a lower rate than a male employee 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, which are performed under similar working conditions.' " [Footnotes omitted.]

Defendants argue to us that the evidence supports the findings of the trial court, and that we are bound to accept the trial court's findings of fact unless they are clearly erroneous. So we are, and we find no clear error in the facts so found. Thus we accept, e. g., the trial court's finding of fact that all freight, except food items, received on the campus, including supplies ordered by the Chemistry Department, was initially received at the Central Stores Stockroom. But credibility is not an issue here. The acceptance of the trial court's findings of fact does not require that we apply the clearly erroneous standard in testing whether the conclusions drawn from the found facts are in accordance with established law. The scope of the clearly erroneous standard does not preclude such inquiry.[13]

■ The crucial question for this court is whether the job which the plaintiff performed required skill, effort and responsibility equal to that required of Mr. Nieman; and it is the plaintiff's burden in establishing her prima facie case to show each of the requirements so named.[14]

We agree with the trial court that the plaintiff has not carried this burden. Much of her argument to us is framed in generic terms, e. g., that she, as well as Nieman, "orders" materials and that she also "receives" and "delivers" supplies, just as he does. But terminology does not govern solution. What we must look to is actual performance. Thus when plaintiff "dispenses" supplies she does so only from the Chemistry Stockroom almost exclusively to chemistry students and teachers by manual delivery. But Nieman's "dispensing" is broader, in scope and magnitude, embracing campus-wide deliveries by car or truck to other storerooms, including that of the Chemistry Department; other loading docks; offices; and dormitories.

Similarly, plaintiff argues that she, as well as Nieman, "receives" supplies. Thus there is a similarity in function. But their actual receipts on the job differed basically. She received supplies for only the Chemistry Stockroom, from Central Stores, and only after Nieman had received those same supplies plus all of the other incoming supplies (except food) for the entire campus.

Thus the two jobs may be said to be somewhat comparable. But comparability is not enough. The test to be applied is that of substantial equality. *Peltier v. City of Fargo, supra; Shultz v. American Can Co.—Dixie Products, supra.* It is clear that the jobs actually performed by plaintiff and Nieman did not demand substantial equality in effort or responsibility. He dealt in

**13.** *See Baumgartner v. United States,* 322 U.S. 665, 670–71, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); *Shultz v. American Can Co.—Dixie Products, supra,* 424 F.2d at 360 n. 6; *Shultz v. Wheaton Glass Co., supra,* 421 F.2d at 267.

**14.** *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049 (5th Cir.), cert. denied, 414 U.S. 822, 94

S.Ct. 121, 38 L.Ed.2d 55 (1973); *Shultz v. American Can Co.—Dixie Products, supra,* 424 F.2d at 360. The requirements of equal skill, equal effort and equal responsibility "are considered to constitute three separate tests, each of which must be met in order for the equal pay standards to apply." 29 C.F.R. § 800.122(a). *See also Dunlop v. General Electric Co.,* 401 F.Supp. 1353, 1355–56 (W.D.Va.1975).

larger volumes, with concomitant requirements of more involved record-keeping, storage, and delivery, necessitating the use of full-time employees and motor transport.[15] Her job concerned the Chemistry Department primarily. What it all boils down to is the difference between campus-wide and departmental responsibility and effort. Thus the trial court's findings that plaintiff's job was not equal in either effort or responsibility to that of Mr. Nieman were amply justified by the law applicable to this record.[16]

We think it not inappropriate to add that, as well as the trial court, we are "not unsympathetic with plaintiff's claims that she has not been fully compensated for her labors." But the Act does not "authorize the Secretary or the courts to engage in wholesale reevaluation of any employer's pay structure in order to enforce their own conceptions of economic worth." *Brennan v. Prince William Hospital Corp., supra,* 503 F.2d at 285.[17]

Under the view we have taken of the case we do not reach the constitutional issue posed.[18]

Affirmed.

---

**15.** We note that prior to July 1974 Nieman's job also required substantially more physical effort than plaintiff's. *See* note 9, *supra.*

**16.** The trial court made no findings as to the relative skills involved, and we will not comment thereon. Such determination is not necessary in view of plaintiff's burden to establish each of the statutory requirements of equal skill, equal effort, and equal responsibility.

**17.** *See also Hodgson v. Corning Glass Works,* 474 F.2d 226, 231 (2d Cir. 1973), *aff'd sub nom., Corning Glass Works v. Brennan, supra; Hodgson v. Miller Brewing Co., supra.*

**18.** *See Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Usery v. Allegheny County Institution District,* 544 F.2d 148, 151 (3d Cir. 1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977).