Alberta GUNTHER, Velence M. Vallance, Marion E. Vanderzanden, Yvonne M. Hatton, Plaintiffs-Appellants,

v.

The COUNTY OF WASHINGTON, Sheriff Warren Barnes, in his capacity as Sheriff of Washington County, Captain Stan Friese and Sergeant Clarence Ramseth, in their capacities as Washington County Police Officers, Defendants-Appellants.

No. 76–3448.

United States Court of Appeals, Ninth Circuit.

Aug. 16, 1979.

other matrons, Dorothy Holiday and Donna Firth, were terminated when the County decided to move the women prisoners into a facility in an adjacent county.

The plaintiffs sued the County, Sheriff Warren Barnes, Captain Stan Friese, and Sergeant Clarence Ramseth[2] under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–1—2000e–17 (1976) ("Title VII"); Holiday and Firth did not sue. Generally, the plaintiffs alleged that the defendants denied them equal pay for equal work and that the defendants terminated them, and later refused to rehire them, in retaliation for their demands for equal pay.

The district court segregated the issues of liability and damages. The liability issue was tried to the court on the basis of depositions, witness summaries, exhibits and testimony. The court entered judgment for the defendants on the merits.

On appeal, the plaintiffs contend (1) they were denied equal pay for work substantially equal to that performed by male guards, and even if the work was not substantially equal, some of the discrepancy in pay can be explained only by sex discrimination; and (2) the defendants retaliated against plaintiffs for asserting equal pay demands by abolishing their jobs, by forcing Vanderzanden to resign, by noting on personnel forms they would not rehire the plaintiffs, and by refusing to rehire Vallance. We affirm in part, reverse in part, and remand for further proceedings.

Carol A. Hewitt, Lindsay, Nahstoll, Hart & Krause, Portland, Ore., for plaintiffs-appellants.

Lawrence R. Derr, Washington County Counsel, Hillsboro, Ore., for defendants-appellants.

Before MERRILL and TANG, Circuit Judges and TAYLOR,* District Judge.

TANG, Circuit Judge:

Plaintiffs Alberta Gunther, Velene Vallance, Marion Vanderzanden, and Yvonne Hatton were four women employed as jail matrons[1] at the Washington County (Oregon) jail. The plaintiffs guarded the inmates in the female section of the county jail; males were employed at a higher rate of pay to guard the inmates in the male section. The jobs of the plaintiffs and two

## I

### Discriminatory Compensation

Prior to June 1973, the male section of the jail was staffed by male deputy sheriffs. The deputy sheriffs were assigned to jail duties on a temporary basis only, as

---

* Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

1. The matron's job titles were periodically readjusted. For the sake of consistency, we use the term "matron" throughout.

2. Sheriff Barnes supervised Captain Friese and Sergeant Ramseth. Friese supervised the persons working in the corrections division, including the matrons and Ramseth. Ramseth's duties related primarily to the handling of prisoners and he apparently had limited authority over the matrons.

part of their training, for periods ranging from several days to one-year. In February 1973, the pay range for a matron was $525–$668; for a deputy sheriff, $736–$940; for a deputy sheriff recruit, $668–$812.

Beginning in late June 1973, the deputy sheriffs were replaced by the position of corrections officers. The corrections officers were assigned to the jail on a permanent basis, and the position was open to both males and females. In February 1973, the salary range for a correction officer was $701–$896; the range for a correction officer trainee was $668–$812.

The district court found that, although the matrons' jobs may have required as much skill as those of the male guards, the matrons' jobs did not require equal effort or responsibility.[3] The court found that the men and women had substantially different workloads. The men and women worked in separate quarters and the male jailers guarded more than ten times as many prisoners as each matron. Unlike the men, the matrons, because they had fewer prisoners to guard, devoted a significant portion of their working time to clerical duties which all parties agreed was less valuable work. Having determined that the work was not substantially equal, the district court stated "that is the end of the inquiry," and disregarded the plaintiffs' claim that some of the discrepancy in their pay was due to sex discrimination.

The plaintiffs dispute these findings. They contend that they were denied equal pay because the male jailers were paid more even though they and the males both performed substantially equal work. Plaintiffs further contend that, even if the work was not substantially equal, the defendants nevertheless violated Title VII if some of the difference in salary between the plaintiffs and the male guards can be attributed to sex discrimination. In order to evaluate these contentions, we must first consider the interrelationship of Title VII and the Equal Pay Act.[4]

A. The Equal Pay Claim

Under the broad coverage of Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice to discriminate against an individual with respect to compensation on the basis of the individual's sex. Section 703(a)(1), codified as 42 U.S.C. § 2000e–2(a)(1). The Equal Pay Act, § 6(d) of the Fair Labor Standards Act, 29 U.S.C. § 206(d), while specifically designed to prohibit discrimination based on sex in the area of compensation, is somewhat narrower in language. The Equal Pay Act prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill effort and responsibility, and which are performed under similar working conditions . . ."[5]

---

**3.** In its analysis, the district court did not distinguish between the deputy sheriffs who worked in the jail, and their replacements, the corrections officers. The record shows that the in-jail duties of the deputy sheriffs and the corrections officers were the same and thus, we likewise find it unnecessary to draw a distinction in comparing their duties to those of the matrons. We do note because the deputy sheriffs must be certified as police officers by the State of Oregon they possess skill and training that the matrons do not have.

**4.** The plaintiffs did not sue under the Equal Pay Act. The Equal Pay Act did not apply to the government employees until May 1, 1974. The Fair Labor Standards Amendments of 1974, Pub.L. 93–259, § 1(a), Apr. 8, 1974, 88 Stat. 55. The plaintiffs' jobs were terminated on January

15, 1974 and thus their claims are cognizable only under Title VII.

**5.** In full, 29 U.S.C. § 206(d)(1) (1970) provides: No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity

The Act provides four affirmative defenses by which an employer can avoid liability despite proof of unequal pay for equal work.

It is plain that the Equal Pay Act overlaps with the coverage of § 703(a)(1) of the Civil Rights Act. *See, e.g., Shultz v. First Victoria National Bank,* 420 F.2d 648, 659 n. 26 (5th Cir. 1969). Both statutes serve the same fundamental purpose of remedying inequality in the area of compensation, and where an equal pay claim has been raised under either or both statutes, the courts have held that the statutes should be construed harmoniously. *Id.; Di Salvo v. Chamber of Commerce,* 568 F.2d 593, 596 (8th Cir. 1978). As a result, courts have looked to decisions interpreting the Equal Pay Act for guidance in examining equal pay claims asserted under Title VII. *See, e. g., Hays v. Potlatch Forests, Inc.,* 465 F.2d 1081, 1083 (8th Cir. 1972).

■ Generally, the Equal Pay Act requires that women receive "equal pay for equal work." *See, e.g., Brennan v. Prince William Hospital Corp.,* 503 F.2d 282 (4th Cir. 1974), *cert. denied* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). Under the Act, the plaintiffs have the burden of proving that they did not receive equal pay for equal work. *E. g., Christopher v. State of Iowa,* 559 F.2d 1135, 1138 (8th Cir. 1977). They are not required, however, to show that the jobs performed are identical. *Peltier v. City of Fargo,* 533 F.2d 374, 377 (8th Cir. 1976); *Usery v. Allegheny County Institutions District,* 544 F.2d 148, 153 (3rd Cir. 1976). Instead, the plaintiffs may prove a violation of the Equal Pay Act by showing that the skill, efforts, and responsibility required in the performance of the jobs is "substantially equal." *Usery v. Columbia University,* 568 F.2d 953, 958 (2d Cir. 1977); *Ridgeway v. United Hospitals—Miller Division,* 563 F.2d 923, 926 (8th Cir. 1977). To make this showing, actual job performance and content—not job titles, classifications or descriptions—is determinative. *See Katz v. School District of Clayton, Missouri,* 557 F.2d 153, 156 (8th Cir. 1977); *Angelo v. Bacharach Instrument Co.,* 555 F.2d 1164, 1171 (3d Cir. 1977). It is the overall job, not its individual segments, that must form the basis of comparison, *see Usery v. Richman,* 558 F.2d 1318, 1320 (8th Cir. 1977), and, because job duties vary so widely, each suit must be determined on a case-by-case basis. *Brennan v. Prince William Hospital Corp.,* 503 F.2d 282 (4th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).

■■ We apply the "clearly erroneous" standard of review in determining whether the district court correctly found that the jobs were not substantially equal. Fed.R. Civ.P. 52(a); *see Di Salvo v. Chamber of Commerce,* 568 F.2d 593, 596–97 (8th Cir. 1978). Our review of the record convinces us that the district court's finding on this issue was not clearly erroneous.

The district court relied heavily on two factors in making its determination: the amount of clerical work performed by the matrons and the prisoner/guard ratio. The record supports the district court's finding that each jailer was responsible for guarding a substantially greater number of prisoners than each matron. Over a six-month period from April to September 1973, the booking records show that the female prisoner population averaged 1.85 inmates per day. The average daily staff of matrons was about 5.5 matrons. Therefore, approximately three matrons were employed for each woman prisoner. In contrast, the average daily staff of 13 male jailers guarded, on the average, between 50 and 60 male inmates per day, or roughly 4 inmates for every guard. In other words, comparing the male and female prisoner/guard ratio, a male guard was typically responsible for 12 times as many prisoners as a matron.[6]

or quality of production; or (iv) a differential based on any other factor other than sex:

Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

6. The parties are not in complete agreement as to importance that should be assigned to the various statistical evidence introduced at trial.

888

The record likewise supports the district court's conclusion that the matrons did substantially more clerical work than the male guards.[7] Because they had fewer prisoners to guard, the matrons were assigned to do clerical work when they had no other work to perform. As a result, they performed substantial clerical work on every shift, including clerical work relating to the male prisoners. Often this work consumed as much as 50% of their working time. In contrast, the males spent very little time performing clerical work which at most pertained to the booking of male prisoners. The plaintiffs do not seriously dispute that clerical work entails substantially less effort and responsibility than guarding prisoners.

The plaintiffs argue that the amount of clerical work and the prisoner-guard ratios were "insignificant" differences that did not justify the wage differentials. According to the plaintiffs, the clerical work was only incidental to their primary duties; the prisoner/guard ratio exaggerates the amount of the males' responsibilities, because the presence of a guard is required no matter how many prisoners there are.

The record, however, supports the conclusion that the greater amounts of clerical work and different prisoner/guard ratio makes the position of male guard qualitatively different than the position of matron. The fact that each male guard was required to guard more than ten times as many prisoners as his female counterpart makes a meaningful difference. As the defendants point out, more is required of a prison guard than making sure the cell doors remain locked. Frequent contact between the prisoners and the guard is necessary, and the district court properly concluded

that the male guard was forced to exert significantly greater effort and was given significantly greater responsibility because of the much greater number of prisoners for which he was responsible. For these reasons, the district court was not clearly erroneous by concluding that the work was not substantially equal.

B. Discriminatory Compensation Claims Not Based on a Demand for Equal Pay

If the plaintiffs' Title VII claim was simply a claim that they were denied equal pay for equal work, our inquiry would stop here. The plaintiffs argue more than this, however. They contend that even if their jobs were not substantially equal to those of the male jailers, they should be allowed to prove that some of the discrepancy in wages was due to sex discrimination. Implicitly, they argue that Title VII is broader in scope than the Equal Pay Act with respect to discriminatory compensation claims.

■ Despite the apparent importance of this question, we have found no reported appellate decision that has considered whether Title VII is broader in scope than the Equal Pay Act in this regard. The cases considering the relationship between Title VII and the Equal Pay Act have involved claims that females were being denied equal pay for equal work. *See, e. g., Di Salvo,* 568 F.2d 593; *Orr v. MacNeill,* 5 Cir., 511 F.2d 166. Quite properly, these cases have construed the two statutes harmoniously; any other approach may have produced different results depending on whether a plaintiff labeled his cause of action as being brought under "Title VII" or under the "Equal Pay Act." These cases did not involve a situation where, as here,

We agree with the district court that the average daily census more accurately reflects the prison's population. The prison's yearly census is not nearly as accurate, because it does not account for the widely-varying lengths of incarceration among the prisoners.

The plaintiff also claims that the average daily population in the women's jail was 3.9 inmates per day, rather than the 1.8 figure provided by the defendants and used by the district court. We have examined both compu-

tations and find that the district court's choice of figures was not erroneous.

7. This district court found that the clerical duties performed by the matrons included processing fingerprint cards and mug shots; filing reports and mug shots; filling out F.B.I. reports; keeping mail and medical records; recording deputy sheriffs' activities; and censoring mail.

the plaintiffs claimed they were compensated discriminatorily even if they did not perform equal work. We conclude that Title VII is broader in scope than the Equal Pay Act; however, the resolution of this issue requires a close analysis of the relationship between the two statutes.

■ The Equal Pay Act, as discussed, applies only to situations where a plaintiff contends there has been a denial of equal pay for equal work. It does not apply, for instance, where the plaintiff is performing comparable (but not substantially equal) work, or where a position held by the plaintiff is unique, see *Rinkel v. Associated Pipeline Contractors*, 17 FEP Cases 224, 226 (D.Alas.1978). In contrast, the language of § 703(a)(1) is much broader than that contained in the Equal Pay Act. Title VII, however, is not silent on its relationship with the Equal Pay Act. An amendment to § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), commonly known as the Bennett Amendment, provides:

> It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of the [the Equal Pay Act].

Two interpretations of the Bennett Amendment are plausible. The Bennett Amendment can be interpreted to incorporate the Equal Pay Act's equal work formula into Title VII. Under this construction, Title VII and the Equal Pay Act would be coextensive in the area of sexually discriminatory compensation and a plaintiff could prove a violation of Title VII only if discriminatory compensation also violated the Equal Pay Act. Alternatively, the Bennett Amendment can be construed as simply incorporating the Equal Pay Act's four affirmative defenses, but not its equal work standard, into Title VII's prohibition. We find the latter interpretation more persuasive.

The relevant legislative history, although sparse, is enlightening. The prohibition against sex discrimination in Title VII was included only shortly before the passage of the Civil Rights Act. As a result, the legislative history behind the sex discrimination component of Title VII is "notable only for its brevity." *General Electric v. Gilbert*, 429 U.S. 125, 143, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). *See Manhart v. Los Angeles Department of Water and Power*, 553 F.2d 581, 587 (9th Cir. 1976), *aff'd in part and rev'd in part on other grounds*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). Because sex was included in Title VII at the last minute, Senator Bennett became concerned that it might conflict with the Equal Pay Act. He proposed his amendment from the Senate floor. The complete "legislative history" of the Bennett Amendment is set out in the margin.[8]

8. Mr. BENNETT. Mr. President, I yield myself 2 minutes.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk read as follows:

On page 44, line 15, immediately after the period, it is proposed to insert the following new sentence:

It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d)).

Mr. BENNETT. Mr. President, after many years of raving by members of the fair sex in this country, and after very careful study by the appropriate committees of Congress, last year Congress passed the so-called Equal Pay Act, which became effective only yesterday. By this time, programs have been established for the effective administration of this act. Now, when the civil rights bill is under consideration, in which the word 'sex' has been inserted in many places. I do not believe sufficient attention may have been paid to possible conflicts between the wholesale insertion of the word 'sex' in the bill and in the Equal Pay Act. The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified. I understand that the leadership in charge of the bill have agreed to the amendment as a proper technical correction of the bill.

Although scant, this dialogue, if anything, supports the interpretation that, Title VII incorporated the Equal Pay Act's four affirmative defenses but not its equal pay formulation. There is no indication that Congress, by the passage of the Bennett Amendment contemplated that the amendment would apply to the kind of situation now before us. Senator Bennett's comment that the purpose of the amendment was "to provide in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified," 110 Cong.Rec. 13647 (1964), most likely referred to the potential for conflict that would arise if the four affirmative defenses contained in the Equal Pay Act were not included in Title VII. Senator Dirksen's remark that "[a]ll that the pending amendment does is recognize these exceptions, that are carried in the basic act," *id.,* appears to be to the same effect.

Language in *Manhart v. City of Los Angeles Department of Power and Water,* 553 F.2d 581 (9th Cir. 1977), also supports our conclusion that the Bennett Amendment was designed to incorporate only the Equal Pay Act's four affirmative defenses. In *Manhart,* the plaintiffs challenged a retirement plan requiring greater contributions from women under § 703 of the Civil Rights Act. In noting that such a plan was unaffected by any of the Equal Pay Act's affirmative defenses, we said "all that the Bennett Amendment did was to incorporate the exemptions of the Equal Pay Act into Title VII," *Manhart,* 553 F.2d at 590. *See Laffey v. Northwest Airlines, Inc.,* 185 U.S. App.D.C. 322, 339, 567 F.2d 429, 446 (1976), *cert. denied* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) ("a sex-predicated wage differential is immune from attack under Title VII only if it comes within one of the four enumerated exceptions to the Equal Pay Act.")

Moreover, the broad remedial policy behind Title VII persuades us that Title VII's plain language should not be limited further in the absence of a clear Congressional directive. Legislative enactments in the area of job-related discrimination have long evinced a general intent to accord parallel or overlapping remedies. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Accordingly, the rights created under Title VII are independent of the rights created by other statutes. *Laffey,* 185 U.S.App.D.C. at 338, 567 F.2d at 445. If we were to limit Title VII's protection against sexually discriminatory compensation practices to those covered by the Equal Pay Act, we would in effect insulate other equally harmful discriminatory practices from review.[9]

---

If they will confirm that understanding, I shall ask that the amendment be voted on without asking for the yeas and nays.

Mr. HUMPHREY. The amendment of the Senator from Utah is helpful. I believe it is needed. I thank him for his thoughtfulness. The amendment is fully acceptable.

Mr. DIRKSEN. Mr. President, I yield myself 1 minute.

We were aware of the conflict that might develop because the Equal Pay Act was an amendment to the Fair Labor Standards Act. The Fair Labor Standards Act carries out certain exceptions.

All that the pending amendment does is recognize those exceptions, that are carried in the basic act.

Therefore, this amendment is necessary, in the interest of clarification.

The PRESIDING OFFICER. (Mr. RIBICOFF in the chair). The question is on agreeing to the amendment of the Senator from Utah. (Putting the question.)

110 Cong.Rec. 13647 (1964).

**9.** Assume for example, that an employer tells a female worker, not employed at a position that is substantially equal to that performed by a male, that he would pay her $30 a week more if she was male. For want of a male counterpart performing equal work, such blatant discrimination would not be prohibited by the Equal Pay Act. *Rinkel,* 17 FEP Cases at 226. We find no indication, however, that the Bennett Amendment was intended to legalize such practices under Title VII. Likewise, in a situation where primarily women are employed in a type of job that is comparable but not substantially equal to that performed by men, an employer is free under the Equal Pay Act to decrease the wages of the women solely because of their sex. Such a practice is prohibited by the plain language of § 703 and will continue to be under our interpretation of the Bennett Amendment.

There is some district court authority that is contrary to our interpretation, *see IUE v. Westinghouse Electric Corp.*, 19 FEP Cases 450 (D.N.J.1979); *Wetzel v. Liberty Mutual Insurance Co.*, 449 F.Supp. 397 (W.D.Pa.1978); *Molthan v. Temple University*, 442 F.Supp. 448 (E.D.Pa.1977), but we do not find these decisions persuasive. Of these cases only *IUE* gave substantial consideration to the issue before us. In support of its conclusion that Title VII and the Equal Pay Act are coextensive in this area, the court in *IUE* relied heavily on cases in which equal pay claims were brought under Title VII. *See id.* at 456. The general rule stated in the cases cited in *IUE*—that Title VII equal pay claims should be judged under Equal Pay standards—is compatible with the view we have taken. Those cases, however, did not consider the issue whether Title VII prohibits conduct outside the scope of the Equal Pay Act, and we see no reason to extend the rationale of those cases to a significantly different issue which they did not address.

The court in *IUE* also relied in part on the 1965 guidelines [10] promulgated by the Equal Employment Opportunity Commission. *Id.* at 455–56. *See* 30 Fed. Reg. 14926–8 (1965). To the limited extent that this guideline is authoritative, *see General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), we do not regard it as contradictory to our holding here. The guidelines acknowledged that § 703(h) was designed to avoid conflicting interpretations "with respect to situations to which both statutes are applicable." Consistently, we hold that Equal Pay Act Standards apply in Title VII suits when plaintiffs raise a claim of equal pay. When plaintiffs raise a claim under Title VII of discriminatory compensation in the absence of an allegation that they perform substantially equal work, no conflict with the Equal Pay Act arises because the Equal Pay Act is inapplicable.

In summary, we hold that, although decisions interpreting the Equal Pay Act are authoritative where plaintiffs suing under Title VII raise a claim of equal pay, plaintiffs are not precluded from suing under Title VII to protest other discriminatory compensation practices unless the practices are authorized under one of the four affirmative defenses contained in the Equal Pay Act and incorporated into Title VII by § 703(h).

We note that problems of proof may present substantial barriers to establishing this kind of discriminatory compensation claim. Such problems, however, are not sufficient reasons to foreclose the plaintiff from the opportunity to establish a claim of discrimination.

At trial, the plaintiffs offered evidence that a portion of the discrepancy between their salaries and those of the male guards could be ascribed only to sex discrimination.[11] We think that on remand the district court should consider this evidence.

## II

### The Retaliations Claims

A. Termination.

In December 1973, the County decided to board its prisoners at the Clackamas County

---

10. This guideline, formerly codified at 29 C.F.R. § 1604.7 (1966) stated that:

     (a) Title VII requires that its provisions be harmonized with the Equal Pay Act (section 6(d) of the Fair Labor Standards Act of 1938, 29 U.S.C. 205(d)) in order to avoid conflicting interpretations or requirements with respect to situations to which both statutes are applicable. Accordingly, the Commission interprets section 703(h) to mean that the standards of equal pay for equal work set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII. However, it is the judgment of the Commission that the employee coverage of the prohibition against discrimination in compensation because of sex is coextensive with that of the other prohibitions in section 703, and is not limited by section 703(h) to those employees covered by the Fair Labor Standards Act.

11. For instance, Sheriff Barnes testified that he thought the disparity between the salaries of the matrons and the deputies should have been less. In fact, the sheriff had previously attempted to upgrade the salary of the matrons.

Jail and, effective January 15, 1974, to replace the six matrons with two and one-half police stenographers. The plaintiffs contend that the County abolished their jobs in retaliation for their claim for equal pay.

The district court found that the County's decision was motivated by legitimate, non-discriminatory objectives, because transferring the women prisoners and replacing them with male prisoners would make better use of jail space, and eliminating the matrons' positions would save money.

Under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."

█ In order to establish a prima facie violation of this section, the plaintiffs must show more than that they protested practices contrary to Title VII and that they were subjected to adverse action by their employer. *Miller v. Williams*, 590 F.2d 317, 320 (9th Cir. 1979). The plaintiffs must also make a showing that links their conduct with the employer's action. *Id.* Once the plaintiffs have made this showing, the defendants have the burden of establishing a legitimate, non-discriminatory reason for taking action adverse to the plaintiffs. *Id.*

█ The district court made no express finding whether the plaintiffs proved a prima facie violation of § 704(a); it found only that the County had a legitimate reason for terminating the plaintiffs. On the record before us, it is questionable whether the plaintiffs showed a sufficient link between their demands for equal pay and the adverse actions taken against them to make a prima facie showing. Assuming arguendo that they have, we find that the district court was not clearly erroneous in determining the County's action was justified by legitimate, non-discriminatory reasons.

Sometime in mid–1973, Sheriff Barnes began receiving complaints from the American Civil Liberties Union (ACLU) about the overcrowded conditions in the men's section of the jail. On November 9, 1973 the ACLU filed a suit against the County seeking to correct these conditions.

The Sheriff's Office began to consider moving the female prisoners to a jail in one of the adjoining counties and eliminating the matron positions. In late November 1973, the undersheriff, Charles Sheratt, prepared a memo in which he determined that the county would save $18,000 a year by acting on the proposed changes. Barnes decided that the county could best alleviate the overcrowded conditions in the men's jail by moving the few female prisoners into a regional facility and moving in the men. There were sixteen cells in the women's prison and there were rarely more than three or four women prisoners in the prison at any given time. The County adopted Barnes' recommendation.

The district court determined that sound economic considerations justified the County's decision. The Court found that between 1971 and 1973, the number of male prisoners processed by the County jumped from 1,884 to 3,270. An increase in "weekend" sentencing, by which low-risk prisoners were allowed to serve time on weekends, aggravated the overcrowding. Conditions became so bad that prisoners were forced to sleep on the floor.

In light of these conditions, we cannot dispute the district court's finding that the abolition of the plaintiffs' job resulted from the legitimate, non-discriminatory purposes of the defendants. Common sense dictated that they alleviate the overcrowding in the men's facility by eliminating the disproportionately more expensive women's facility.

B. Denial of Vanderzanden's Request for Leave of Absence.

In September 1973, Vanderzanden applied for a leave of absence without pay because she had become physically disabled. Sheriff Barnes denied the request and Vanderzanden resigned. Vanderzanden contends that the defendants denied her leave in retaliation for her demands for equal pay.

■ The district court found that, even if the County had the burden of proving legitimate reasons for discharging Vanderzanden, it had met its burden by showing that Vanderzanden was encouraged to resign because her superiors justifiably believed that she could no longer do the job. The record supports the district court's determination.

In 1972 Vanderzanden injured her shoulder in a fall while leaving work. As a result, she was absent from work for four months, two and one-half months of which was unpaid leave.

In August 1973, Vanderzanden, then 56 years old, developed blood clots in her leg, a problem that she had intermittently since 1966. She exhausted all her sick and vacation benefits, and applied for a 90 day unpaid leave of absence. Sergeant Ramseth told Vanderzanden that her leave of absence would not be granted. Ramseth said that her poor health made it impossible for her to perform her job effectively. Vanderzanden tendered her resignation.[12] At the time of her resignation, Vanderzanden's doctor would not permit her to return to work because of her ill health.

Assuming that Vanderzanden has made a prima facie showing of retaliation, we do not find that the district court's determination that the decision to deny Vanderzanden leave was justified by legitimate business reasons is clearly erroneous. Unfortunate as the County's decision may have been, it was justified by the record. Vanderzanden's prolonged absences from work, her chronic physical ailments, and inability to perform fully her job duties justifies the County's decision.

Vanderzanden presented evidence that Undersheriff Sheratt was granted a leave of absence as a means of showing that she was unfairly treated. We do not think that this evidence overcomes the showing made by the defendant. Sheratt was automatically entitled to take his paid leave of absence, and returned to work only after obtaining a release from his doctor.

C. Personnel Action Forms.

At the time the plaintiffs were terminated, Sheriff Barnes signed a written "Personnel Action" form for each of them. In answer to the question "would you rehire this employee," the Sheriff checked "no" on each form. He checked "yes" on the forms for the two matrons, Holiday and Firth, who were not plaintiffs to this suit.

■ The district court made no express finding as to whether the Sheriff's notation constituted a Title VII violation. It held only that the plaintiffs did not present sufficient evidence to prove that they were harmed by the notation. We find that the plaintiffs did not establish a prima facie violation of § 704(a), and do not decide whether the sheriff's action was harmful to the plaintiff.[13]

As we have discussed, to establish a prima facie violation, the plaintiffs must show that there is a link between their assertion of their Title VII rights and the adverse action taken by the defendants. *Miller*, 590 F.2d at 320. The plaintiffs have failed to demonstrate such a link here. They presented no direct evidence that the sheriff's notations on the personnel action forms were the result of retaliation for the plaintiffs' request for equal pay. Furthermore, the plaintiffs presented no circumstantial evidence that the sheriff acted in response to the plaintiffs' equal pay demands. Moreover, the plaintiffs never confronted the Sheriff with their demands and at best the Sheriff had only a vague awareness that matrons in general were demanding equal pay. After careful examination of the rec-

---

**12.** The parties dispute whether Vanderzanden was "terminated" or "forced to resign". We find that the characterization is immaterial and assume that Vanderzanden was terminated.

**13.** The fact that the district court failed to make an explicit finding of fact on the existence of a prima facie violation does not pre-

clude us from deciding this issue, especially where the record consists primarily of documentary evidence. *See Magna Weld Sales Co. v. Magna Alloys & Research Pty.*, 545 F.2d 668, 671 (9th Cir. 1976); *Armstrong v. Collier*, 536 F.2d 72, 77 (5th Cir. 1976).

ord, we can find no evidence to infer that the Sheriff knew the plaintiffs, and not Holiday and Firth, were raising equal pay claims. Only if there is evidence that the Sheriff actually knew that the plaintiffs raised such claims, rather than other matrons, can we infer that the Sheriff gave negative recommendations to the plaintiffs and positive recommendations to the other matrons for vindictive reasons. The plaintiffs presented no such evidence. Having not shown that the defendants were aware which matrons were actively supporting the claim for equal pay, the plaintiffs have not proved the necessary link between their demands and the defendants' adverse action that would establish a prima facie violation of § 704(a).

D. Refusal to Rehire Vallance.

 For a similar reason, we find that the plaintiffs did not establish that the defendants' refusal to rehire Vallance was a prima facie violation of § 704(a).

On December 26, 1973, after she had been notified that she would be terminated, Vallance wrote to the Sheriff requesting a transfer to the newly created position of police stenographer. Vallance indicated that she had passed all the necessary civil service tests for the position. Two days later, the Sheriff wrote to Vallance, denying her request and stating that the positions would be filled by somebody else.

On January 15, 1974, Holiday and Firth made formal written applications for the police stenographer positions; the Sheriff hired both that same day. Because neither had passed the required civil service examination at that time, their appointments were made provisional pending completion of the tests. Firth later failed the examination and was terminated. Vallance contends that the Sheriff's refusal to rehire her was in retaliation for her equal pay demands.

The district court denied Vallance's claim, finding that the Sheriff's appointments of Holiday and Firth were within his discretion under Oregon law. The court noted that Holiday had a good work record and

that Firth had a satisfactory one, and that both had more seniority than Vallance.

We need not dwell long on this contention. The plaintiffs presented no direct evidence that the defendants chose Holiday and Firth over Vallance for vindictive reasons. Nor can we infer vindictiveness. There is nothing in the record that shows that defendants were aware that it was Vallance, and not Holiday and Firth, who actively sought higher pay.

Because the plaintiffs have failed to show a prima facie violation of § 704(a), we need not decide whether the Sheriff's refusal to rehire Vallance was justified by legitimate business reasons.

Affirmed in part, reversed in part, and remanded for further proceedings to afford plaintiffs the opportunity to establish a claim of sexual discrimination apart from an equal pay claim.

