Delores GERLACH, Hilda S. Howard, Barbara A. Fetter, Dawn M. Jones, Marianne L. Tittl, Rosemary Kurr, Mary M. Cline, June D. Timpf, Barbara J. Baker, Nellie Reiter, Elaine Graul, Kathleen Swantek, Irene Wojewodzic, and all others similarly situated, Plaintiffs,

v.

**MICHIGAN BELL TELEPHONE COMPANY, a Michigan Corporation, Defendant.**

**Civ. A. No. 77–71715.**

United States District Court, E. D. Michigan, S. D.

Sept. 15, 1980.

Elaine Grand Stulberg, Sommers, Schwartz, Silver & Schwartz, P. C., Southfield, Mich., for plaintiffs.

Virginia F. Metz, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for defendant.

## OPINION AND ORDER GRANTING IN PART, DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT

PATRICIA J. BOYLE, District Judge.

This is an action seeking relief for various alleged sexually discriminatory employment practices and policies of Defendant, Michigan Bell Telephone Company. Defendant, Michigan Bell Telephone Company, is a Michigan corporation with its principal office in Detroit. Plaintiffs are women who are or have been employed as Engineering Layout Clerks by Michigan Bell Telephone Company.[1] Plaintiffs' claim in the proposed amended complaint (Second Amended Complaint) is that they are being denied compensation privileges and opportunities in employment on the basis of their sex in that, on the one hand, they have been segregated and classified on the basis of sex in such a way as to deny or tend to deny them job opportunities, which by a series of employment policies and practices thwart their transfer into higher paid but less valuable craft jobs (Count I); and on the other hand, they are not being paid the true value of their work to the employer on a comparable basis with men in the craft classifications (Count II). Further, Plaintiffs claim that Defendant maintains a discriminatory promotion and transfer system (Counts III and IV). This matter presently comes before the Court on Defendant's Motion for Summary Judgment as to Count I of the First Amended Complaint and Plaintiffs' Motion for Leave to Amend Complaint (to file a second amended complaint).

The Engineering Layout Clerk classification is a predominantly female, clerical or non-craft classification. The Field Assistant classification was a traditionally all-male craft classification until October of 1973 when a female was promoted to the position. The pay scale for Field Assistants is higher than that paid Engineering Layout Clerks. The management position of Plant Engineer was primarily filled by males who were first trained in the job of Field Assistant.

Plaintiffs, as Engineering Layout Clerks, analyze data related to the performance of a "job order," such as the installation of telephone poles. The job functions of Engineering Layout Clerks include: originating finished drawings for job orders from a Field Engineer's notes, recording material and labor costs on job orders and estimates, performing detail drawings on estimates, posting commercial estimate figures, and making schematic drawings. Each Engineering Layout Clerk performs her work at a specific office maintained by the Defendant to serve a local geographic area. The supervisory responsibility for the Engineering Layout Clerk's work is vested in an Engineering Layout Supervisor.

The Field Assistant position was phased out on or about March 1, 1976. Persons formerly employed in the job classification of Field Assistant performed the following duties: obtaining field engineering data for the preparation of job orders and estimates involving outside plants, performing miscellaneous routine work in connection with cost computations and the preparation of job orders and estimates, and occasionally, under close supervision, preparing plans for estimates and job orders. At least a portion of the Field Assistant's work was performed outside at the actual plant site. The supervisory responsibility for the Field Assistant's work was vested in a Plant Engineer.

Delores Gerlach and thirty-three other women classified as Engineering Layout Clerks filed written charges against Michigan Bell Telephone Company with the Equal Employment Opportunity Commission (EEOC) on June 4, 5, and 11, 1973. They charged that Michigan Bell Telephone

---

1. Plaintiffs have not yet been certified as a class.

Company discriminated against them in that their job was substantially similar to the Field Assistant classification and that the male members of that classification received higher wages. On September 12, 1975, the Commission, after deferring to the state agency for the required time and the state agency having made no findings, found reasonable cause to believe that Michigan Bell Telephone Company had committed a violation of Title VII of the Civil Rights Act of 1964. On or about May 6, 1977, Plaintiffs were advised that Michigan Bell Telephone Company had not achieved compliance with Title VII, and that Plaintiffs were entitled to initiate a civil action in federal district court within ninety days.

Plaintiffs brought suit in the District Court for the Eastern District of Michigan on July 13, 1977. The complaint alleged discrimination on the basis of sex in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, the Equal Pay Act of 1963, 29 U.S.C. § 206(d), the Michigan Civil Rights Act, M.C.L.A. § 37.2101 *et seq.*, the Michigan Fair Employment Practices Act, M.C.L.A. § 423.301 *et seq.*, and Defendant's common law duty, derived from the Michigan Penal Code, M.C.L.A. § 750.556, not to discriminate against women in the payment of wages.

On October 21, 1977, Defendant moved to dismiss all but six of the Plaintiffs from the Equal Pay Act cause of action and to dismiss the Plaintiffs' claims for compensatory and punitive damages under each of their state causes of action, or in the alternative, to dismiss each of the state causes of action for lack of pendent jurisdiction.

On November 18, 1977, Plaintiffs filed their first amended complaint. On January 20, 1978, Plaintiffs moved for default judgment on their cause of action under the Civil Rights Act of 1964 and on their cause of action under the Equal Pay Act of 1963 as to the six women not addressed in Defendant's motion to dismiss.

In a Memorandum Opinion and Order by the Honorable Charles W. Joiner, dated April 4, 1978, the Defendant's motion to dismiss Plaintiffs' claims under the Michigan Civil Rights Act, the Michigan Fair Employment Practices Act, and common law tort for lack of pendent jurisdiction was granted. The Defendant's motion to dismiss all but six of the Plaintiffs from the Equal Pay Act cause of action was treated as a motion for summary judgment and granted as to any plaintiff who worked in an "establishment" maintained by the Defendant which did not concurrently employ a Field Assistant.[2] The Plaintiffs' Motion for Default Judgment was denied.

Plaintiffs' claims remaining after the April 4, 1978, order were based on Title VII and the Equal Pay Act. In the original complaint, Count I, designated as a Title VII wage rate claim, alleged that Defendant discriminated against Plaintiffs in compensation in that either the two classifications of Engineering Layout Clerk and Field Assistant required equal work, or if the two jobs were not equal, the Engineering Layout Clerk classification required work of equal or greater value than the classification of Field Assistant. Count II, designated a Title VII promotional claim, alleged that few Engineering Layout Clerks had been promoted to Plant Engineer and that the ones that had been promoted were required to gain prior experience as Engineering Layout Supervisors. Count III, designated as the Equal Pay Act claims, alleged that as the two classifications of Engineering Layout Clerk and Field Assistant required equal work, the wage differential between the two classifications could not be based on any factor other than sex.

On June 2, 1978, two motions for summary judgment were filed on behalf of Defendant. The first sought to dismiss all of the claims of two of the named Plaintiffs based on their deposition testimony that they did not have personal claims of either wage or promotion discrimination against

---

**2.** The Court held that the term "establishment" referred to each individual office maintained by Defendant.

Defendant.[3] The second summary judgment motion sought dismissal of the promotion claims of seven of the named Plaintiffs.[4] Hearing dates were not set on these motions.

On October 27, 1978, a third motion for summary judgment was filed on behalf of Defendant. This motion, presently before the Court in conjunction with the motion for leave to amend the complaint, seeks to dispose of all of the Plaintiffs' wage claims under both Title VII and the Equal Pay Act.[5] Those portions of the motion accepted and presented as relevant to the present issue contend that, under the Bennett Amendment to Title VII, no Title VII pay violation can be established unless the Court finds that Defendant has violated the Equal Pay Act.

On December 13, 1978, Plaintiffs moved for an order compelling discovery and an adjournment of the hearing on Defendant's Motion for Summary Judgment. On December 29, 1978, Plaintiffs' Motion for Order Compelling Discovery and Motion for Adjournment of Hearing on Defendant's Motion for Summary Judgment was heard by this Court.[6]

At the December 29, 1978, hearing, Plaintiffs contended that the answers to seven questions[7] were necessary in preparing their response to Defendant's Motion for Summary Judgment. Plaintiffs explained that in Count I, Paragraph 25, of their first amended complaint they were asserted both an equal pay claim and a comparable worth claim.[8] Plaintiffs stated that they intended to abandon their equal pay claims, effectively eliminating all of Count III and that portion of Count I of their First Amended Complaint alleging an equal pay claim. However, they alleged that the proposed discovery to ascertain the answers to their seven questions was relevant to the factual substance of their comparable worth claim. Defendant asserted that the questions were not relevant to the summary judgment motion or the wage claims and that a comparable worth claim would not sustain a cause of action under Title VII.

The Court granted Plaintiffs' Motion for Discovery as to questions one through six, denied Plaintiffs' Motion for Discovery as to question seven, and denied Plaintiffs' Motion for Adjournment of the Summary Judgment hearing. Further, as it had become apparent that there was a substantial difference of opinion as to the nature of the claims asserted in Count I of Plaintiffs' First Amended Complaint, the Court suggested that Plaintiffs prepare a motion for leave to amend so that the specific nature of the claims could be clarified.

3. Defendant's Motion for Summary Judgment was filed against Barbara J. Baker and Irene Wojewodzic.

4. Defendant's Motion for Summary Judgment was filed against Elaine Graul, Dawn Jones, Barbara Fetter, Kathleen Swantek, June Timpf, Marianne Tittl, and Rosemary Kurr.

5. Counts I and III of Plaintiffs' Complaint.

6. The case was reassigned from Judge Joiner to Judge Boyle on October 31, 1978.

7. The seven questions at issue were:
 1. Whether any of the work performed by Engineering Layout Clerks had ever originally been performed by Plant Engineers?
 2. Whether there were ever any conversations that the position of Engineering Layout Clerk had originally been designed for women?
 3. Whether the witness has ever heard any conversation about any jobs other than Plant Engineer being closed to women?

4. and 5. and 6. Whether there had ever been any conversations that the position of Plant Engineer was closed to women? [Apparently, this question was asked in three different ways.]
7. The number and sex of the Engineering Layout Clerks in 1952?

8. Paragraph 25 of Count I states as follows:
 25. Defendant Corporation has discriminated against Plaintiffs in compensation because of their sex in that either the two classifications of Engineering Layout Clerk and Field Assistant require equal work, the performance of which require equal skill, effort, and responsibility and are performed under similar working conditions; or, in the alternative, if the two jobs are not equal, the Engineering Layout Clerk classification requires work of equal or greater value and involves equal or greater levels of skill, responsibility, and ability, performed under similar or less desirable working conditions than the classification of Field Assistant.

On January 16, 1979, Plaintiffs, following the suggestion of the Court, moved for leave to amend their complaint. The Plaintiffs' claims in the proposed second amended complaint, presently before the Court, are set forth in four counts. In proposed Count I, designated "Classification Claims," Plaintiffs allege that the Engineering Layout Clerk position is classified as clerical because the position is predominantly female and underpaid because it is classified as clerical. In proposed Count II, designated "Comparable Worth/Under–Valuation," Plaintiffs allege that their work is of equal or comparable worth as that of men and that Defendant has undervalued their work and, consequently, underpaid them. In proposed Count III, designated "Promotion Claims," Plaintiffs allege sex discrimination regarding transfers and/or promotions between jobs in the clerical and craft classifications. In proposed Count IV, designated "Promotion for Management," Plaintiffs allege that Defendant has engaged in an employment practice which has required females in Plaintiffs' class to be subjected to higher entry qualifications into the Plant Engineering job title than have been imposed on males in the craft classification. All four counts of Plaintiffs' proposed Second Amended Complaint are based upon a violation of Title VII.[9]

Defendant filed a Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend Complaint on February 21, 1979. Defendant alleges that the Proposed Amended Complaint, if allowed, would change the entire nature of the lawsuit. Defendant opposes Plaintiffs' Proposed Second Amended Complaint on four grounds, any one of which Defendant claims would be a basis for denying leave to amend:

I. Plaintiffs are guilty of undue delay in seeking an amendment since there are no new facts warranting an amendment at this time.

II. Plaintiffs' proposed amendments fail on the merits and are subject to a Rule 12(b) motion to dismiss.

III. Plaintiffs' proposed amendments would be highly prejudicial to Defendant.

IV. The trial of this lawsuit will be substantially delayed and complicated if Plaintiffs' proposed amendments are allowed to be filed.

As to its assertion that Plaintiffs' Proposed Second Amended Complaint fails on its merits, Defendant contends that the Proposed Second Amended Complaint introduces two new jobs (Estimate Assigner and Plant Assigner) in Count I, Count II, and

---

**9.** On February 21, 1979, Count III of Plaintiffs' First Amended Complaint, denominated Equal Pay Act Claims, was dismissed with prejudice by order of the Court.

As to the dismissal of that portion of Count I, the Equal Pay Act claims contained in Paragraph 25, counsel were unable to reach a stipulation and agreement. Plaintiffs' proposed *Stipulation of Dismissal and Deletion* read, in pertinent part:

It is further stipulated and agreed that certain language contained in paragraph 25 of Count I of Plaintiffs' complaint will be deleted and said paragraph after deletion will read as follows:

'25. Defendant corporation has discriminated against Plaintiffs in compensation because of their sex in that the Engineering Layout Clerk classification requires work of equal or greater value and involves equal or greater levels of skill, responsibility and ability performed under similar or less desirable working conditions than the classification of Field Assistant.'

All claims arising from the language which has been deleted from paragraph 25 of Count I of Plaintiffs' complaint may be dismissed from this action with prejudice.

Defendant's proposed Stipulation and Agreement of Dismissal read, in pertinent part regarding paragraph 25:

'25. Defendant corporation has discriminated against Plaintiffs in compensation because of their sex in that the Engineering Layout Clerk classification requires work of equal or greater value and involves equal levels or greater levels of skill, responsibility and ability.'

All claims arising from the language which has been deleted from paragraph 25 of Count I of Plaintiffs' Complaint, including Plaintiffs' Title VII claim of equal pay for equal or substantially equal work, may be dismissed from this action with prejudice.

This disagreement capsulizes the contested issue regarding whether a comparable worth claim states a cause of action and is sustainable under Title VII.

Count III; that Plaintiffs are now raising the issue of craft versus clerical job classification; and additionally, that Plaintiffs are seeking to introduce four entirely new Title VII claims. According to Defendant's allegations, the first of these new claims is in proposed Count I, where Plaintiffs allege that the Engineering Layout Clerk position is classified as clerical and underpaid solely because the position is predominantly female. The second is in proposed Count III, where Plaintiffs allege sex discrimination regarding transfers and/or promotions between all jobs in the clerical and craft classifications. The third and fourth are in proposed Count II, where Plaintiffs allege that the positions of Plant Assigner and Estimate Assigner are of equal value to the position of Engineering Layout Clerk.

Defendant submits that all of the Plaintiffs' purported new Title VII claims are subject to dismissal. Defendant bases its claim of futility on four arguments:

1. All of Plaintiffs' new claims are beyond the scope of the EEOC charges, investigation, determination and conciliation and therefore this Court lacks jurisdiction to adjudicate these claims under Title VII.

2. A claim of equal value or comparable worth is not cognizable under Title VII.

3. Count I is merely a restatement of Plaintiffs' Title VII wage claim and is therefore governed by Defendant's motion for summary judgment.

4. Plaintiffs' claim of discriminatory transfer and/or promotion between the craft and clerical job classifications is barred by the AT&T Consent Decree.[10]

Plaintiffs' Response to Defendant's Opposition Memo, filed on February 28, 1979, asserts that the proposed Second Amended Complaint serves only to clarify and refine the claims and issues of the First Amended Complaint. These claims are summarized by Plaintiffs' statement that "the Defendant has discriminated against the Plaintiffs and the class they seek to represent on the basis of sex by maintaining sex–segregated classifications, by its promotional policy and its application, and in compensation." [*See*, Plaintiffs' Response to Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend, p. 6.] Plaintiffs deny that they are guilty of undue delay, that the proposed Second Amended Complaint is prejudicial to Defendant or would result in a complication of issues, and that their amendments fail on their merits.

Plaintiffs' Motion for Leave to Amend their complaint was heard by this Court on March 5, 1979. Oral argument focused on Count II of the proposed Second Amended Complaint wherein Plaintiffs allege sex discrimination in compensation on the theory of comparable worth and under–valuation.

Defendant asserted that the motion, as regards the comparable worth claim, should be denied for the reason that such a cause of action does not exist under Title VII and, therefore, to allow amendment would be futile. Defendant also incorporated its argument into its Summary Judgment Motion and thereby continued to assert by way of Motion For Summary Judgment that no cause of action for sex discrimination in compensation, other than a claim which would support an Equal Pay Act case, exists under Title VII.

---

**10.** However, Defendant stipulates that Plaintiffs are entitled to amend and replace Count II of their original Complaint with Paragraphs 58- 61, 62, 62(a), 62(c), 63, and 64 of their proposed Second Amended Complaint (Count IV) pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Defendant further stipulates to the amendment and replacement of Paragraph 25 of the original Complaint by Paragraphs 45–50 of the proposed Second Amended Complaint *only* as Paragraphs 45–50 relate to the positions of Engineering Layout

Clerk and Field Assistant. Defendant does *not* stipulate to any of the language in proposed Paragraphs 45–50 regarding the specific positions of Estimate Assigner and Plant Assigner and the general craft classifications.

Defendant objects to the General Allegations (Paragraphs 19–31), Count I, Count III, Paragraph 62(b), and Count II as it relates to the craft classifications, Plant Assigner and Estimate Assigner. [*See* Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend Complaint, p. 3.]

Following oral argument, the Court took the motion under advisement.[11]

In summary the essence of Plaintiffs' claims against their employer is that they are being denied compensation privileges and opportunities in employment on the basis of their sex. The motion presently before the Court, however, singles out for attack Plaintiffs' allegations as claimed in proposed Counts I and II.

The question as formulated by the parties is whether the Bennett Amendment to Section 703(h) of Title VII, 42 U.S.C. § 2000e–2, limits sex–based wage discrimination claims under Title VII to conduct which could also be actionable under the Equal Pay Act of 1963, 26 U.S.C. § 206(d). The parties' formulation of the issue results from their coupling of the claims contained within proposed Counts I and II. Defendant asserts that all compensation claims based on sex discrimination and brought under Title VII must, as a result of the Bennett Amendment, be judged exclusively under the Equal Pay Act standards. Plaintiffs assert that the effect of the Bennett Amendment on such a claim is only to incorporate into Title VII the four affirmative defenses set forth in the Equal Pay Act and that this interpretation of the Bennett Amendment is necessary to give full effect to the legislative purpose underlying Title VII.

Plaintiffs and Defendant agree that the answer to the question is purely a matter of statutory construction. However, at this juncture, agreement between the parties ends.

For reasons to be articulated in the following discussion, the Court does not accept the coupling of Counts I and II but rather considers the merits of the counts individually. Nonetheless, inquiry into the legislative history of Title VII and the Bennett Amendment is required.

By way of introduction to the ensuing discussion, the relevant statutes are:

Sections 703(a)(1) and (2) of Title VII provide in part that it shall be an unlawful employment practice for an employer:

(1) to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1), (2).

The Bennett Amendment, Section 703(h) of Title VII, provides, in pertinent part, that:

It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29 (the Equal Pay Act).

42 U.S.C. § 2000e–2(h).

The provisions of the Equal Pay Act referred to in the Bennett Amendment provide that:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except

---

**11.** Supplemental memoranda of law were filed by Defendant on March 26, 1979; August 20, 1979; October 4, 1979; May 23, 1980; and July 23, 1980; and by Plaintiffs on April 13, 1979; September 19, 1979; April 15, 1980; June 9, 1980; and July 28, 1980.

...where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor than sex....

29 U.S.C. § 206(d)(1).

As stated above, the issue is whether the Bennett Amendment to Section 703(h) of Title VII limits Plaintiffs' claims under Title VII to conduct which would also be actionable under the Equal Pay Act. Under Defendant's construction, Title VII and the Equal Pay Act would be co–extensive in the area of sexually discriminatory compensation, and a plaintiff could prove a violation of Title VII only if the discriminatory compensation also violated the Equal Pay Act. Plaintiffs contend that the Bennett Amendment incorporates the Equal Pay Act's four affirmative defenses, but not its equal work formula into Title VII's prohibitions.

It should be noted that this Court concurs in the observation by the court in *IUE v. Westinghouse Electric Corp.*, 631 F.2d 1094 (3d Cir. 1980) (hereinafter, *IUE* (3rd Cir.)), that "[t]he instant case pushes us to the edge of subtle concepts of statutory construction. It involves sophisticated aspects of personnel policies and job classifications and it rests on a legislative history which is not totally free of ambiguity." *Id.*, at 1096. With this in mind, the Court has examined the statutory construction, the legislative history of the relevant statutes, the subsequent administrative interpretations of the statutes, and cases addressing the issue. Having reviewed the foregoing, I have concluded that Count I of Plaintiffs' Proposed Second Amended Complaint does state a cause of action while Count II does not.

The first comprehensive federal pay bill was introduced on July 21, 1945. Hearings on S. 1187 before the Special Subcomm. of the Senate Labor Comm., 79th Cong., 1st Sess. (1945). Essentially, the bill was based upon successful experiences under the War Labor Board, which in 1942 had issued a general order calling for adjustments to equalize "the wages or salary rates paid to females with the rates paid to males for comparable quality and quantity of work on the same or similar operations ...." General Order No. 16, as amended, reprinted in Wartime Wage Control and Dispute Settlement 135 (1945). *See* Vladek, "The Equal Pay Act of 1963," 18 N.Y.U. Conf. on Labor 381, 388 (1966). However, neither this bill nor any similar measures proposed in each Congress over the following seventeen years received favorable action.

It was not until the 87th Congress that an equal pay act was again seriously considered. During 1962, the House Committee on Education and Labor held extensive hearings and considered a number of equal pay bills. After the administration proposal emerged from committee, an amendment was offered and passed on the House floor which required equal pay for *equal*, rather than *comparable*, work. 108 Cong.Rec. 14711. The same year the Senate also passed similar equal pay legislation. However, the Senate action occurred late in the session, and the two bills failed to be fully reconciled before Congress adjourned.

The Administration, again, recommended equal pay legislation when the 88th Congress convened in 1963. Hearings were held in both the House and the Senate. A major debate in the House focused on the use of the word "equal" instead of "comparable." Representative Goodell, a member of the House Subcommittee on Labor, emphasized that when "the House changed the word 'comparable' to 'equal' the clear intention was to narrow the whole concept." 109 Cong.Rec. 9197.[12]

12. Representative Goodell stated:

> I think it is important that we have clear legislative history at this point. Last year when the House changed the word 'comparable' to 'equal' the clear intention was to narrow the whole concept. We went from 'comparable' to 'equal' meaning that the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other.
>
> We do not expect the Labor Department people to go into an establishment and attempt to rate jobs that are not equal. We do not want to hear the Department say, 'Well,

Bills subsequently emerged from both the Senate and the House. S.1409, 88th Cong., 1st Sess. (1963); H.R. 6060, 88th Cong., 1st Sess. (1963). The Senate version, S.1409, was ultimately adopted. Senator McNamara, submitting the Report from the Committee on Labor and Public Welfare to accompany S.1409, stressed that the key requirement of S.1409 was that an employer may not discriminate in the payment of wages for equal work. S.Rep.No. 176, 88th Cong., 1st Sess. 2 (1963).[13]

On June 10, 1963, President Kennedy signed the Equal Pay Act. It became effective on June 11, 1964.[14] *See* Ross & McDermott, "The Equal Pay Act of 1963: A Decade of Enforcement," 16 B.C.Indus. & Com. L.Rev. 1, 3 (1974).

Thus, the Equal Pay Act was a product of careful consideration by Congress. Numerous Congressmen and various groups tried consistently from 1945 to 1963 to get a comparable work standard in the Act. Nevertheless, when Congress authorized the Act, it rejected the comparable work standard and stated that "we do not expect the Labor Department people to go into an establishment and attempt to rate jobs that are not equal." 109 Cong.Rec. 9197. Therefore, it can be concluded that Congress intended that the Equal Pay Act "not be invoked to mandate equality of pay for jobs of different content." *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1173 (3d Cir. 1977).

On June 11, 1963, President Kennedy announced that he would seek civil rights legislation in the 88th Congress. On June 19, 1963, nine days after signing the Equal Pay Act, he sent a draft proposal to Congress.

On June 20, 1963, Congressman Cellar, Chairman of the House Judiciary Committee, introduced H.R. 7152. As reported, H.R. 7152 was a broad civil rights measure. The equal employment opportunity provisions were in Title VII.

H.R. 7152 did not in any way refer to discrimination with respect to sex either when proposed or during the several months it was considered by the House Judiciary Committee. H.R.Report No. 414, 88th Cong., 1st Sess. (1963). Therefore, sex discrimination in employment was not subject to hearings. Hearings on H.R. 7152 before the House Judiciary Comm. 88th Cong., 1st Sess. (1962). *See also* Gett and Gelb, "Beyond the Equal Pay Act: Expanding Wage Differential Protections under Title VII," 8 Loyola Law Journal 723, 743 (1977). However, near the end of the House debate, on February 8, 1964, Congressman Smith of Virginia proposed an amendment to add sex as a prohibited basis of discrimination. 100 Cong.Rec. 2577–84.

The amendment was opposed by several staunch supporters of the bill. Congresswoman Green, a sponsor of the Equal Pay

---

they amount to the same thing,' and evaluate them so they come up to the same skill or point. We expect this to apply only to jobs that are substantially identical or equal. I think that the language in the bill last year which has been adopted this year, and has been further expanded by reference to equal skill, effort, and working conditions, is intended to make this point very clear.
109 Cong.Rec. 9197.

**13.** He further clarified the purpose of the legislation by noting:

The objective of this legislation is to insure that those who perform tasks which are determined to be equal shall be paid equal wages.

The wage structure of all too many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be

paid more than a woman even though his duties are the same. This bill would provide, in effect, that such an outmoded belief can no longer be implemented and that equal work will be rewarded by equal wages.
S.Rep.No.176, 88th Cong., 1st Sess. 1 (1963).

**14.** The word "equal" resulted in narrow interpretation of the Equal Pay Act from the time of its implementation in 1964 until the cases of *Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3d Cir.) *cert. denied*, 389 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), and *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). *See* Gett and Gleb, "Beyond the Equal Pay Act: Expanding Wage Differential Protections Under Title VII," 8 Loyola Law Journal 723, 742 (1977). These cases held that the standard for comparing jobs was not "identical," but "substantially equal."

Act, argued against the Smith Amendment stating, "[I]t will clutter up the bill and it may later–very well–be used to help destroy this section of the bill by some of the very people who today support it." 110 Cong.Rec. 2581. Congressman Cellar stated, "I think the amendment seems illogical, ill–timed, ill–placed and improper." 110 Cong.Rec. 2587.[15]

However, several women representatives who supported the Civil Rights Bill urged the adoption of the sex amendment. The strongest statement in favor of adding sex to Title VII was made by Representative Martha Griffiths. She stressed that unless sex was included in the Act, both black women and white women would be unable to obtain employment because the anti–discrimination sections would apply only to men. 110 Cong.Rec. 2578.[16]

The Smith Amendment was adopted by the House on the same afternoon it was proposed by a vote of 168 to 133. Thus, Congress deliberately concluded that there were persuasive reasons for immediate positive action against sex discrimination . as well as race, color, and religious discrimination. Margolin, "Equal Pay and Equal Employment Opportunities for Women," 19th N.Y.U.Conf. on Labor 297, 305 (1964).[17]

The entire bill was approved by the House on February 10, 1964. Unfortunately, no further consideration was given to the effect of the amendment on the Equal Pay Act.

It was not until H.R. 7152 was presented to the Senate that concern was expressed about the relation of the Title VII sex discrimination ban to the Equal Pay Act. Early in the Senate debate, Senator Dirksen submitted a memorandum questioning a number of provisions in the bill. As one of the floor managers of the bill, Senator Clark prepared answers to the questions relating to Title VII. 110 Cong.Rec. 7212–18. One of Senator Clark's responses concerned a possible conflict between Title VII and the Equal Pay Act.[18]

Apparently not completely satisfied with the explanation given, Senator Bennett introduced his proposed amendment to Section 703(h) on June 12, 1964.[19] Senator

15. It has been suggested that the Smith Amendment was a diversionary tactic intended only to defeat the Act as a whole. *See* Kanowitz, "Sex Based Discrimination in American Law III, Title VII of the 1964 Civil Rights Act and the Equal Pay Act of 1963," 20 Hastings Law Journal 305, 311 (1963). Cited in favor of this view is the fact that the amendment was opposed by staunch supporters of the bill and that Smith and nine other men who spoke in favor of the sex amendment ultimately voted against the bill.

16. The other women representatives who spoke in favor of the amendment were Representatives May and St. George. Representative May stated that since 1923 various women's groups and parties around the country had been lobbying for legislation to protect women from ˙discrimination. 110 Cong.Rec. 2578. Representative St. George reminded the House that women workers, notwithstanding the passage of the Equal Pay Act the previous year, still did not receive equal pay for equal work. She urged the addition of sex into the employment title of the civil rights bill in order to assure full employment rights for all women. 110 Cong.Rec. 2578–84.

17. Further, when Congress adopts any legislation, one must infer a Congressional intention that such legislation be effective to carry out its underlying social policy. *See* Kanowitz, *supra*, at 312.

18. The question and response were as follows:
Objection: The sex antidiscrimination provisions of the bill duplicate the coverage of the Equal Pay Act of 1963. But more than this, they extend far beyond the scope and coverage of the Equal Pay Act. They do not include the limitations in that act with respect to equal work on jobs requiring equal skills in the same establishments, and thus, cut across different jobs.
Answer: The Equal Pay Act is a part of the wage hour law, with different coverage and with numerous exemptions unlike Title VII. Furthermore, under Title VII, jobs can no longer be classified as to sex, except where there is a rational basis for discrimination on the ground of bonafide occupational qualification. The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable situation under Title VII.
110 Cong.Rec. 7217.

19. Senator Bennett's proposed amendment provided that:
It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determin-

Bennett stated that, "the purpose of my amendment is to provide that in the event of conflicts the provisions of the Equal Pay Act shall not be nullified. I understand that the leadership in charge of the bill have agreed to the amendment as a proper technical correction of the bill." 110 Cong. Rec. 13647.

The leadership did agree to the amendment. Senator Humphrey stated that the amendment was "fully acceptable." 110 Cong.Rec. 13647. Senator Dirksen explained that:

> We are aware of the conflict that might develop because the Equal Pay Act was an amendment to the Fair Labor Standards Act; the Fair Labor Standards Act carries out certain exceptions. All that the pending amendment does is recognize those exceptions, that are carried in the basic act.

110 Cong.Rec. 13647.

The Senate adopted the amendment by voice vote.

After the Bennett Amendment had been adopted, Senator Humphrey, floor manager in the Senate of the Civil Rights Bill, was called upon to interpret the amendment. He was asked by Senator Randolph, during the course of the floor debate, if social security benefit plans, as well as other industrial benefit plans which treated women and men differently, would become illegal upon passage of Title VII. Humphrey replied that the Bennett Amendment guaranteed that those plans could continue in operation. 110 Cong.Rec. 13663–64.

Before final passage of the Civil Rights Act of 1964 by the House, Congressman Cellar, the floor manager for the bill in the House, was also called upon to explain the purpose of the Bennett Amendment. The Congressman stated that the Bennett Amendment "provides that compliance with the Fair Labor Standards Act as amended satisfies the requirements of the title [Title VII] banning discrimination because of sex." 110 Cong.Rec. 15896. The House, with only this explanation, voted to accept the Senate bill without change.

The purpose of the Bennett Amendment was re–emphasized one year later in 1965. At this time Senator Bennett offered an amendment to the Senate's cloture rule to allow an additional five minutes for senators to explain legislative amendments after the invocation of cloture. 111 Cong.Rec. 13359. Senator Bennett explained that he believed additional time would be helpful for purposes of legislative history. He noted that after cloture had been invoked during the debate on Title VII the Senate leadership had urged him *not* fully to explain the Bennett Amendment since time was limited. He stated, "I followed their recommendations, the amendment was adopted and now my purpose is being questioned." 111 Cong.Rec. 13359. Senator Bennett then presented for printing in the Record a brief prepared by his staff with an explanation of the amendment. The brief concluded that, "Simply stated, the amendment means that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act." 111 Cong.Rec. 13359.[20]

---

ing the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d)).

110 Cong.Rec. 13647.

**20.** More fully, the Brief explained that:

The amendment speaks in terms of a 'differentiation ... authorized by the provisions of section 6(d) of the Fair Labor Standards Act.' Section 6(d) authorizes two things:

1. Wage differentials as between exempt male and female employees doing the same work; and

2. Wage differentials on *equal* jobs made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production or (iv) a differential based on any other factor other than sex.

The amendment therefore means that it is not an unlawful employment practice (a) to differentiate on the basis of sex in determining the compensation of white collar and other employees who are exempt under the provisions of the Fair Labor Standards Act; or (b) to have different standards of compensation for nonexempt employees, where such

Senator Dirksen, who had been part of the Senate leadership at the time the Bennett Amendment was passed, was present in 1965 when Senator Bennett offered his amendment to the cloture rule. He emphasized that the Senate "had in mind precisely the point made by the Senator from Utah [Bennett] when the amendment was submitted." He further added, "I believe that the language [of the Bennett Amendment] speaks for itself." 111 Cong.Rec. 13360.

Title VII was clearly enacted as a broad civil rights measure to prohibit discrimination in employment. The Smith Amendment, equally as clearly, represents a conclusion by Congress that there were persuasive reasons for positive action against sex discrimination in employment.

The vague legislative history of the Bennett Amendment, however, suggests two possible interpretations. The Bennett Amendment could be interpreted to incorporate the Equal Pay Act's equal work formula into Title VII. Alternatively, the Bennett Amendment could be construed as simply incorporating the Equal Pay Act's four affirmative defenses, but not its equal work standard, into Title VII's prohibition.

The view that the Bennett Amendment merely incorporates the four affirmative defenses is supported by the language of Senator Dirksen in agreeing to the amendment. In contrast, the view that the Bennett Amendment incorporates the entire equal work formula is supported by the language of Senator Bennett in proposing

differentiation is not prohibited by the equal pay amendment to the Fair Labor Standards Act.
111 Cong.Rec. 13359.

21. The 1972 and 1978 amendments to Title VII fail to clarify the legislative intent.

22. In support of this view, Defendant reasons that:
At the time that Senator Bennett offered his amendment, H.R. 7152 already provided that it was not unlawful for an employer to base compensation on 'a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production.' 110 Cong.Rec. 12723. This is the same language that appears in the first sentence in Section 703(h) of Title VII. These affirmative defenses are the same as three of

the amendment, as well as the subsequent explanations of the amendment by Senator Humphrey and Representative Cellar. Furthermore, the "equal work" view is supported by the statement of Senator Bennett in 1965 that "the amendment means that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act," 111 Cong. Rec. 13359, and Senator Dirksen's accompanying assertion that "we had in mind precisely the point made by the Senator from Utah [Bennett] when the amendment was submitted ...," 111 Cong.Rec. 13360.

Thus, the legislative history of Title VII is contradictory.[21]

Looking to the statutory language, the Defendant contends that the only way that the Bennett Amendment can be given meaning is to hold that it incorporates into Title VII something more than the four affirmative defenses of the Equal Pay Act. Under this view, any conduct that is not prohibited by the Equal Pay Act is "authorized" by the Act, and thus no claim of discrimination in compensation violates Title VII unless it also violates the Equal Pay Act.[22]

Plaintiffs contend that it defies common English usage to conclude that everything that is not *prohibited* by a statute is *authorized* by it. Plaintiffs note that *Black's Law Dictionary* defines "authorize" as "to give a right or authority to act." Thus, under Plaintiffs' view, a more natural read-

the four Equal Pay Act affirmative defenses. The fourth Equal Pay Act affirmative defense–differentiation in wages based on a 'factor other than sex'–hardly needed to be incorporated into Title VII by the Bennett Amendment since Title VII would not even apply unless the employer was discriminating on the basis of sex. 42 U.S.C. Section 2000e–2(a). On its face, therefore, the Bennett Amendment cannot be construed to incorporate only the Equal Pay Act affirmative defenses into Title VII. Plaintiffs' interpretation would render the Bennett Amendment meaningless ....
Defendants' Third Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion to File an Amended Complaint, p. 18.

ing, and one that does not do violence to the purpose of the statute, is that the Bennett Amendment refers to the four stated exceptions in the Equal Pay Act as "authorizing" certain practices that Congress did not regard as discriminatory, i. e., that a violation of the Equal Pay Act or Title VII does not occur where the wage differential is based upon seniority, merit, or the quality or quantity of production. Plaintiffs' Response to Defendants' Memorandum in Opposition, pp. 15–17.

Reference to the administrative interpretations of Title VII similarly does not materially advance the resolution of this issue. In 1965 the Equal Employment Opportunity Commission promulgated guidelines explaining its view of the scope of Title VII. The Commission's guidelines interpreted Section 703(h) to mean that in situations in which both statutes are applicable "the standards of 'equal pay for equal work' set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII." 30 Fed. Reg. 14927.[23]

In 1972 the Commission issued a new guideline, which is presently in force. The new guideline states that "by virtue of Section 703(h) a defense based on the Equal Pay Act may be raised in a proceeding under Title VII ...." 29 C.F.R. 1604.8.[24] The new guideline does not appear expressly to adopt the equal work formula, but neither does it expressly reject that formula.

In a 1971 decision, however, the Commission did expressly reject the equal work formula. In the decision, the Commission found that women performing clerical work were underpaid vis–a–vis men doing craft work in violation of Title VII. The Commission considered the possibility of a defense under Section 703(h) but rejected it. The Commission reasoned:

[S]ection 703(h) was intended to ensure consistency in the administration of Title VII and the Equal Pay Act. Since the policy at issue here is not within the intended scope of the Equal Pay Act, it clearly cannot be 'authorized' by that Act within the meaning of Section 703(h) of

---

**23.** The full text of the guideline codified at 29 C.F.R. 1604.7 stated:

(a) Title VII requires that its provisions be harmonized with the Equal Pay Act (section 6(d) of the Fair Labor Standards Act of 1938 29 U.S.C. 206(d)) in order to avoid conflicting interpretations or requirements with respect to situations to which both statutes are applicable. *Accordingly, the Commission interprets section 703(h) to mean that the standards of 'equal pay for equal work' set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII.* However, it is the judgment of the Commission that the employee coverage of the prohibition against discrimination in compensation because of sex is coextensive with that of the other prohibitions in section 703, and is not limited by section 703(h) to those employees covered by the Fair Labor Standards Act.
(b) Accordingly, the Commission will make applicable to equal pay complaints filed under Title VII the relevant interpretations of the Administrator, Wage and Hour Division, Department of Labor. These interpretations are found in 29 Code of Federal Regulations, Part 800.119–800.163. Relevant opinions of the Administrator interpreting 'the equal pay for equal work standard' will also be adopted by the Commission.

(c) The Commission will consult with the Administrator before issuing an opinion on any matter covered by both Title VII and the Equal Pay Act." (Emphasis added.)
Note: The Commission explained that they had proceeded with caution in interpreting the scope and application of Title VII's prohibitions in sex discrimination in employment as there was "little relevant legislative history to serve as a guide to the intent of Congress in this area." 30 Fed.Reg. 14927.

**24.** The full text of the guideline provides:

(a) The employee coverage of the prohibitions against discrimination based on sex contained in Title VII is coextensive with that of the other prohibitions contained in Title VII and is not limited by section 703(h) to those employees covered by the Fair Labor Standards Act.
(b) By virtue of section 703(h), a defense based on the Equal Pay Act may be raised in a proceeding under Title VII.
(c) Where such defense is raised the Commission will give appropriate consideration to the interpretations of the Administrator, Wage and Hour Division, Department of Labor, but will not be bound thereby.
29 C.F.R. 1604.8.

Title VII. Accordingly, we hold that Respondent Employer's 'prevailing community wage' system discriminates on the basis of sex against the affected class of Charging Parties and all other similarly placed female employees of Respondent Employer, in violation of Title VII.

EEOC Decisions 6300 (1971); (CCH) Employment Practice Guide, 71–1619 Paragraph 6300 at 4539 (1971).

Thus, while the 1965 Commission guidelines appeared to support Defendant's view, the present position of the Commission, as illustrated by its 1971 decision, supports Plaintiffs' position.[25]

Although it has been suggested recently in *IUE* (3rd Cir.), *supra*, that the 1965 and 1972 Commission guidelines/regulations, see, nn. 22, 23 *supra*, are consistent with each other, it is my opinion that the regulations can, in candor, only be read as consistent by straining the 1965 regulations' reference to situations "to which both statutes are applicable" to suggest by negative implication that in situations in which they are not applicable, Title VII coverage is broader than the Equal Pay Act. Given this view the Court declines to rely on the *IUE* (3rd Cir.) view of the regulations but does concede that the ambiguity in the 1965 regulations supports the conclusion that the Commission was aware that there might be situations in which both statutes would *not* be co–extensive. Because this Court cannot conclude that the regulations are consistent and the 1965 regulation is ambiguous, the administrative guidelines on this issue are not of assistance.

The case law with respect to this issue is relatively recent and sparse. One of the first cases to discuss Section 703(h) of Title VII was an Equal Pay Act case. In *Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696 (1970), the court cited Title VII in the context of analyzing whether extra tasks which were given to men otherwise performing the same job as women made the job so dissimilar as to be outside the scope

of the Equal Pay Act. The *Shultz* court observed that Congress had never intended that an artificially created job classification, which did not substantially differ from the genuine one, could provide an escape for an employer from the operation of the Equal Pay Act. The court emphasized that such a view was strengthened by the subsequent adoption of Title VII.

The court further discussed the relationship between Title VII and the Equal Pay Act as follows:

> Although the Civil Rights Act is much broader than the Equal Pay Act, its provisions regarding discrimination based on sex are in pari materia with the Equal Pay Act. This is recognized in the provision of Section 703(h) of the Civil Rights Act (42 U.S.C. Section 2000e–2(h)) that an employers' differentiation upon the basis of sex in determining wages or compensation shall not be an unlawful employment practice under the Civil Rights Act if the differentiation is authorized by the Equal Pay Act. Since both statutes serve the same fundamental purpose against discrimination based on sex, the Equal Pay Act may not be construed in a manner which by virtue of Section 703(h) would undermine the Civil Rights Act.

421 F.2d at 266.

The *Shultz* court declined to delineate the precise manner in which the two statutes should be harmonized to achieve the Congressional objective. Instead, it held that, even if Title VII is not considered, the Equal Pay Act alone does not permit artificial classifications to prevent an inquiry into whether there exists a difference in pay for equal work.

The Fifth Circuit in *Hodgson v. Brookhaven General Hospital*, 463 F.2d 710 (5th Cir. 1970), agreed with the *Shultz* court that the purposes of the Equal Pay Act and Title VII are interrelated and should be harmonized. However, the Fifth Circuit rejected the Third Circuit's suggestion that Title VII could be used to expand the coverage of the

---

**25.** Plaintiffs also rely on a speech by Daniel Leach, Vice–Chairman of EEOC, as supporting their view. Plaintiffs' Response to Defendants' Memorandum in Opposition, p. 25.

Equal Pay Act to jobs which were not the same. The Fifth Circuit stated:

> At least one federal court of appeals has suggested that equal pay should be required for a 'male' job and a 'female' job which are in fact unequal if the reservation of the higher paid job to males would be impermissible under Title VII .... We reject that approach because we believe it is destined to yield unfair results.

436 F.2d at 727.

Thereafter, two appellate courts cited language from *Shultz* to hold that in Title VII cases plaintiffs must prove unequal pay for equal work in order to make out a claim for discrimination in compensation. In *Ammons v. Zia*, F.E.P. Cases 909 (D.N.M.1970), *aff'd*, 448 F.2d 117 (10th Cir. 1971), the district court denied relief to the plaintiff on her claim under Title VII for wage discrimination based upon sex. The Tenth Circuit in affirming stated: "Moreover, to establish a case of discrimination under Title VII, one must prove a differential in pay based on sex for performing equal work." *Id.*, at 120.

A similar position was taken by the Fifth Circuit in *Orr v. Mac Neill and Son, Inc.*, 511 F.2d 166 (5th Cir.), *cert. denied*, 423 U.S. 65 (1975). In *Orr* the plaintiff brought a Title VII action claiming that she had been discriminated against because of her sex in that her male co-workers were receiving higher salaries.

The district court had found that the jobs of plaintiff and her co-workers were equal. The Fifth Circuit, reversing the district court's finding, stated: "The sex discrimination provisions of Title VII of the Civil Rights Act of 1964 must be construed in harmony with the Equal Pay Act of 1963, 29 U.S.C.A. § 206(d)." *Id.*, at 170. The

court held that: "To establish a case under Title VII, it must be proved that a wage differential was based upon sex and that there was the performance of equal work for unequal compensation." *Id.*, at 171.

Thus, relying upon *Shultz, Hodgson*, and *Ammons*, the *Orr* court restricted Title VII's prohibition against sex discrimination in compensation to the scope of the Equal Pay Act.[26]

The *Orr* decision established that a *prima facie* case for wage discrimination based upon sex under Title VII could be made only if equal work performance had been proven by the person who claimed discrimination. Thereafter, nearly every court which considered the issue placed upon the plaintiff the initial burden of showing equal work and unequal pay before a sex-based claim of wage discrimination was cognizable under Title VII.

Such decisions include: *Molthan v. Temple University*, 442 F.Supp. 448, 455 (E.D. Pa.1977) ("[A]ny Title VII claim alleging sex based discrimination in salary will fail if the complained of acts do not amount to a violation of the Equal Pay Act."); *Chrapliwy v. Uniroyal, Inc.*, 15 F.E.P. Cases 795, 806 (N.D.Ind.1979) ("Under [Title VII] the court's initial inquiry is always: Are the jobs held by a male and a female substantially equal?"); *Howard v. Ward County*, 418 F.Supp. 494, 503 (D.N.D.1976) (same); *DiSalvo v. Chamber of Commerce of Greater Kansas City*, 416 F.Supp. 844, 849 (W.D. Mo.1976) (The question is "whether defendant discriminated in salary between males and females who performed substantially equal work."); *Wetzel v. Liberty Mutual Ins. Co.*, 449 F.Supp. 397, 400 (W.D.Pa.1978) ("An employer who violated Title VII by

---

26. *See* Gitt and Gelb, *supra* at 755, stating:

> The reliance of those courts upon *Wheaton Glass* and *Brookhaven General Hospital* is especially misplaced. It should not be construed in such a manner as to undermine one another. The similar purposes of the Equal Pay Act and Title VII are held to imply that the Equal Pay Act should not be narrowly interpreted in instances where employers were violating Title VII by excluding women from positions which they are capable of

> performing. Hence, in *Wheaton Glass* the court suggested that Title VII could broaden the scope of the Equal Pay Act, at least in terms of interpreting the availability of the defenses contained in the Act. Although the Eighth Circuit in *Brookhaven General Hospital* rejected that suggestion and held that Title VII did not broaden the scope of the Equal Pay Act, the decision does not suggest that the Equal Pay Act could narrow the scope of Title VII.

segregating job classifications by sex is not liable ... unless the two jobs being compared were substantially equal ...."); *Roberts v. Western Airlines*, 425 F.Supp. 416, 428 (N.D.Cal.1976) ("To demonstrate a denial of Equal Pay under Title VII, plaintiffs must show that (1) the work of the employees of one sex required the exercise of substantially equal skill, effort, and responsibility and was performed under similar working conditions as that of employees of the opposite sex, and (2) the pay to men and women was unequal."); *EEOC v. Colby College*, 439 F.Supp. 631, 637 (D.Me.1976) ("Any possible conflict between the Equal Employment provision of the Civil Rights Act of 1964 and Equal Pay Act is to be resolved in favor of the latter."); and *Kohne v. Imco Container Co.*, 480 F.Supp. 1015, 1039 (W.D.Va.1979) ("Plaintiffs have not established a practice which is unlawful under the Equal Pay Act. For these reasons the wage rates do not violate the provisions of Title VII.")[27]

Thus, Defendant correctly contends that traditionally courts have required that all compensation claims based on Title VII be judged exclusively under the Equal Pay Act criteria. For the same reason, the first courts to consider the equal *value* theory overwhelmingly rejected it on the rationale that Congress intended to preclude all wage discrimination claims which did not meet the criterion of the Equal Pay Act. *See Christensen v. Iowa*, 563 F.2d 353 (8th Cir. 1977), *IUE v. Westinghouse Electric Corp.*, 17 F.E.P. Cases 16 (N.D.W.Va.1977), *Lemons v. City & County of Denver*, 17 F.E.P. Cases 906 (D.Colo.1978), *aff'd*, 620 F.2d 228 (10th Cir. 1980), *IUE v. Westinghouse Electric Corp.*, 19 F.E.P. Cases 450 (D.N.J.1970), *rev'd*, *IUE* (3rd Cir.), *supra*.

Illustrative of the reasoning of these courts, the district court in *IUE v. Westinghouse Electric Corp.*, 17 F.E.P. Cases 16 (N.D.W.Va.1977), after reviewing the legislative history of the Equal Pay Act and rejecting the equal value claim, stated:

> The Court believes that the Congressional intent, so clearly evidenced in the Equal Pay Act, to restrict judicial scrutiny only to those sex based wage discrimination claims where equal work is being performed applies to similar claims under Title VII. The Bennett Amendment serves to underscore the desire of Congress to apply the equal work standard in applicable Title VII cases.
>
> Thus, even though a plaintiff alleges intentional sex discrimination, a claim based upon wage differentials must be premised on the fact that equal work is being performed.

*Id.*, at 22.

Until very recently virtually every court which considered the issue had held that Title VII wage claims must be judged exclusively under the Equal Pay Act, and the courts had consistently refused to recognize a cause of action pursuant to Title VII based on an allegation of comparable or equal worth.

However, three circuits have now recognized Title VII wage compensation claims in situations where the defendant claims preclusion under the Equal Pay Act. In *Gunther v. County of Washington*, 602 F.2d 882 (9th Cir. 1979),[28] plaintiffs were jail matrons employed by the County of Washington. They guarded the inmates in the female section of the county jail, while males were employed at a higher rate of pay to guard the inmates in the male section. Generally, the plaintiffs alleged that the defendants denied them equal pay for equal work in violation of Title VII.

The district court applied the equal pay standards and concluded that the jobs were

---

**27.** *Johnson v. Bridgeport*, 20 F.E.P. Cases 1766 (D.Conn.1979); *Davis v. Western Electric Co.*, (M.D.N.C.1979) (Opinion supplied to court); *Chapman v. Pacific Telephone & Telegraph Co.*, 456 F.Supp. 65 (N.D.Cal.1978) (Opinion supplied to court as Exhibit A, Defendant's Motion For Summary Judgment on Counts I and III of the Amended Complaint); *United States v. City of Milwaukee*, 441 F.Supp. 1371, 1375 (E.D.Wis.1977).

**28.** *Aff'd on rehearing*, 623 F.2d 1303 (9th Cir. 1980).

not substantially equal.[29] Based on this conclusion, the trial court terminated its inquiry and dismissed the action.

On appeal the plaintiffs contended that they were denied equal pay for work substantially equal to that performed by male guards *and* that, even if the work was not substantially equal to that of the male guards, at least some of the discrepancy in pay was the result of sex discrimination. The Ninth Circuit affirmed the district court's determination that the jobs at issue were not substantially equal. However, the court did not terminate its inquiry based on that conclusion. Rather, it observed:

> If the plaintiffs' Title VII claim was simply a claim that they were denied equal pay for equal work, our inquiry would stop here. The plaintiffs argue more than this, however. *They contend that even if their jobs were not substantially equal to those of the male jailers, they should be allowed to prove that some of the discrepancy in wages was due to sex discrimination. Implicitly, they argue that Title VII is broader in scope than the Equal Pay Act with respect to discriminatory compensation claims.*

*Id.*, at 888 (emphasis added).

Hence, the issue before the Ninth Circuit was whether a cause of action existed under Title VII for sex discrimination in compensation when that claim was not based on an equal pay for equal work theory *and* did not meet the standards for equal work set forth in the Equal Pay Act.

After reviewing the legislative history of the Bennett Amendment, applicable case law, and the policy underlying Title VII, the court concluded:

> In summary, we hold that, although decisions interpreting the Equal Pay Act are authoritative where plaintiffs suing under Title VII raise a claim of equal pay,

plaintiffs are not precluded from suing under Title VII to protest other discriminatory compensation practices unless the practices are authorized under one of the four affirmative defenses contained in the Equal Pay Act and incorporated into Title VII by Section 703(h).

*Id.*, at 891.

In March, 1980, the Tenth Circuit issued *Fitzgerald v. Sirloin Stockade*, 624 F.2d 945 (1980). Plaintiff, in *Fitzgerald* was a female former employee of Sirloin Stockade. She had held positions in various departments, including printing, training, advertising, and purchasing.

In the advertising department, plaintiff worked under the director, Mr. Powell. After a month, Mr. Powell left this position and gave up all his duties except for some of the art work. He continued to do this work on an hourly basis. The plaintiff performed Powell's other duties. However, she did not obtain either the position, the title, or the pay of the director.

Plaintiff brought suit under Title VII alleging that Sirloin Stockade had discriminated against her consistently and continuously throughout her employment because of her sex.[30] The district court ruled in favor of plaintiff.

On appeal the Tenth Circuit considered the issue of whether the evidence supported the district court's finding of discrimination in connection with the denial of compensation to plaintiff for her services in the advertising department. Sirloin Stockade contended that the Title VII claims concerning discrimination with regard to compensation were controlled by the Equal Pay Act and that, as plaintiff did not perform the same work as Powell, there could be no

---

**29.** The court found that the men and women had substantially different workloads. The men and women worked in separate quarters and the male jailers guarded more than ten times as many prisoners as each matron. Unlike the men, the matrons, because they had fewer prisoners to guard, devoted a significant portion of their working time to clerical duties which all parties agreed was less valuable work.

**30.** Plaintiff's complaint covered a wide range of positions and discriminatory practices. However, the court's interpretation of the Bennett Amendment focused on plaintiff's position in the advertising department.

finding of discrimination.[31] Plaintiff conceded that she did not perform the same work as her predecessor but claimed that a finding of discrimination could be made under Title VII.

The Tenth Circuit described the precise issue as "whether discrimination with regard to compensation which is outside the purview of the Equal Pay Act could violate Title VII." *Id.*, at 953 n.2.

The court concluded as follows:

This is not a case in which a discriminatory activity is specifically sanctioned under the Equal Pay Act exceptions and liability is, nonetheless, sought under Title VII. Here a finding of discrimination under Title VII does not conflict with the provisions of the Equal Pay Act. It was found that the plaintiff was discriminated against solely because of her sex in a manner which is not within the scope of the Equal Pay Act. This finding does not offend the Bennett Amendment and Equal Pay Act standards and should not be controlling.

*Id.* The Tenth Circuit did not review the legislative history of the Bennett Amendment nor did it rely on *Gunther*.

On August 1, 1980, the Third Circuit in *IUE v. Westinghouse Electric Corporation, supra,* reversed the district court's grant of defendant's motion for partial summary judgment. The lower court had granted defendant's motion on the basis that Title VII did not prevent sex discrimination in setting wage rates for different categories of jobs unless it could be shown that the jobs, regardless of the reason for their classification, involved equal or substantially equal work.

On appeal, the majority characterized plaintiff's claim as follows:

[T]hat the Westinghouse Electric Corporation ... had set the wage rates lower for those job classifications which were predominantly filled by females than the wage rates for those job classifications which were predominantly filled by males. Plaintiff claimed that this disparity was attributable to the fact that the company deliberately paid lower wages for those types of work which would be done predominantly by women.

*Id.*, at 1096.

As in *Gunther* and *Sirloin Stockade,* defendants claimed, as does Defendant here, "that Title VII did not prevent sex discrimination in setting wage rates for different categories of jobs unless it could be shown that the jobs, regardless of the reason for their classification, involved equal or substantially equal work." *Id.*, at 1096.

The court analyzed the legislative history of the Bennett Amendment and the regulations and rulings of the EEOC and concluded that the Bennett Amendment did not authorize the explicit discrimination in compensation that plaintiffs asserted defendant had practiced. Precisely, the majority stated, "[b]ecause we hold that this alleged intentional discrimination in formulating classifications of jobs violates Title VII, we will reverse." *Id.*, at 1097. Dissenting, Judge Van Dusen took issue with the majority's characterization of plaintiff's claim.

The majority opinion describes a case in which sex based wage discrimination and liability under 703(a)(1) of Title VII of the Civil Rights Act ... will be established by evidence that an express policy of sex based wage discrimination exists at Westinghouse's Trenton facility. If I understood the case to involve only this issue, I would join in the court's order.

*Id.*, at 1108.

Judge Van Dusen rejected the majority's view that the claim was a classification claim under 703(a)(2), 2000e–2(a)(2), and noted that plaintiff's complaint alleged a compensation claim which he believed, on the record, could "only be proved through evidence of the worth of comparable work." The issue thus framed by the dissent was whether a sex–based discrimination claim can be made out under Title VII on the basis of evidence of comparable work. Analyzing the legislative history of the Ben-

---

**31.** It should be noted that the trial judge had made a mistaken reference to the Equal Pay Act in his findings, in that the plaintiff had brought suit only under Title VII.

nett Amendment and the Equal Pay Act's rejection of the comparable work approach and construing Title VII and the Equal Pay Act in pari materia, Judge Van Dusen concluded that Title VII must be interpreted "in a fashion consistent with the Equal Pay Act's rejection of the comparable work doctrine" and held that the Bennett Amendment incorporated the equal work requirement into Title VII.

The United States Supreme Court has not ruled on this issue, and there is no authority on point from the Sixth Circuit. *See Calage v. University of Tennessee*, 544 F.2d 297 (6th Cir. 1976).

■ In summary the review of applicable precedents demonstrates that every court which considered the relationship of Title VII to the Equal Pay Act, from 1970 to 1979, placed upon the plaintiff the initial burden of showing equal work and unequal pay before a sex–based claim of wage discrimination could be shown. While many of these cases could be distinguished as "equal pay" cases, none of them contain language suggesting that unsuccessful plaintiffs, who failed to prove equal work, could nevertheless proceed under Title VII on any other basis. Nonetheless, the legislative history, the construction of the statute, more recent authority which this Court finds persuasive, and the policy considerations upon which Title VII was premised lead me to conclude that the recent decisions cited above correctly hold that the Bennett Amendment was not intended to limit Title VII sex–based wage discrimination claims to only those claims which would also be cognizable under the Equal Pay Act.

■ A violation of the Equal Pay Act may occur in the absence of any intent to discriminate. However, the first sentence of Section 703(h) provides that:

[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e–2(h).

This sentence, literally read, requires the obvious conclusion that the Bennett Amendment does not legalize intentionally discriminatory practices under Title VII.

Title VII was broadly drafted with the objective of eradicating invidious discrimination in the workplace. An interpretation of the Bennett Amendment which would permit deliberate and intentional discrimination in wages would require the conclusion that Congress intended to "authorize" an intentionally discriminatory employment practice. Such an interpretation would be offensive to the essential purpose of Title VII. Furthermore, it would conflict with the opinion of the Supreme Court in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), which held that Congress' overall intent in Title VII was to prohibit invidious discrimination against minorities and women.

A determination that the Bennett Amendment permitted deliberate and intentional discrimination would also result in different interpretations of Title VII for different protected groups, since the Equal Pay Act applies only to sex–based differentials. So to conclude would be to read a remedial statute (Equal Pay Act) as a limitation on the intended scope of another remedial statute (Title VII). The legislative history of the addition of sex as a protected category to Title VII makes it clear that Congress did not intend that women would be provided with less of a remedy under Title VII than is available to other protected groups. Therefore, I conclude that the broad policy behind Title VII requires that the Bennett Amendment should be read consistently with the balance of Section 703(h) and held inapplicable to discrimination in compensation that is the result of an intention to discriminate on the basis of sex.

■ The policy in issue in Count I, that is discriminatory classification, cannot be construed as "authorized" by the Equal Pay Act or by Section 703(h). Count I [Paragraphs 37, 39, 40, and 43(a), (b), and (c)] alleges that Defendant has assigned and classified certain job titles solely on the basis of sex and has thereby denied Plaintiffs wages, benefits, and promotional opportunities. Assuming arguendo that Count I is a wage claim (as Defendant contends), Title VII does not preclude an assertion of this allegation.

For reasons previously expressed, I am unwilling to conclude that Congress intended to preclude a victim of intentional sex-based discrimination from seeking redress unless she meets the requirements of the Equal Pay Act. Such alleged discrimination is outside the purview of the Equal Pay Act.

As the court stated in *Fitzgerald v. Sirloin Stockade* : "This is not a case in which a discriminatory activity is specifically sanctioned under the Equal Pay Act exceptions and liability is, nonetheless, sought under Title VII. Here a finding of discrimination under Title VII does not conflict with the provisions of the Equal Pay Act." *Id.,* at 953 n.2.

■ However, as earlier indicated, it is my opinion that Count II fails to state a cognizable claim under Title VII. Plaintiffs have conceded that they do not claim any Equal Pay Act violations. Nor have Plaintiffs alleged in Count II intentional sex-based wage discrimination. The Court agrees with Defendant's observation that the question is not whether or how the Bennett Amendment exceptions are incorporated into Title VII, but rather, the issue is whether a comparable worth/under-valuation claim is cognizable under Title VII. *See* Defendant's Fifth Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File Amended Complaint, p. 3. Count II must, therefore, stand or fall under Title VII solely on the basis of comparable worth/under-val-

uation, a claim which was not recognized in either *Gunther, Fitzgerald,* or *IUE* (3rd Cir.),[32] (as in each instance the court concluded that additional sex-based wage discrimination claims were made out).

In *Gunther* the court held that plaintiffs' inability to prove substantially equal work did not preclude a Title VII claim and that the plaintiffs should be allowed to prove that some of the wage discrimination alleged was due to sex discrimination. The court noted, however, that "because a comparable work standard cannot be substituted for an equal work standard, evidence of comparable work, although not necessarily irrelevant in proving discrimination under some alternative theory, will not alone be sufficient to establish a prima facie case." *Gunther,* 623 F.2d 1303, 1321.

Similarly, the plaintiffs' claims in *IUE* (3rd Cir.) did not involve an independent claim based solely on under-valuation/comparable worth. Rather, the majority characterized the plaintiffs' claim as a wage rate classification claim (42 U.S.C. § 2000e-2(a)(2)) in which plaintiffs claimed that the company "deliberately paid lower wages for those types of work ..." done by women. The majority concluded that "because we hold that this alleged intentional discrimination in formulating classifications of jobs violates Title VII, we will reverse [the district court holding]." *IUE* (3rd Cir.), at 1097.

The dissent of Judge Van Dusen is based on his belief that the claim could be proven only through comparison of the worth of comparable work, a contention which Judge Van Dusen felt was precluded by the Equal Pay Act.

■ Thus, neither *Gunther* nor *IUE* (3rd Cir.) support Plaintiffs' claim that a comparable worth/under-valuation claim *per se* states a cause of action under Title VII. Count II does not allege intentional sex-based wage discrimination. Short of rewriting or ignoring the gravamen of the claims in proposed Count II, Count II can-

**32.** The Court has had the benefit of the complaints in *Gunther* and *IUE.* Neither complaint alleges a comparable worth/under-valuation claim standing alone.

not be read to allege anything more than that the failure properly to value Plaintiffs' work has resulted in Plaintiffs' loss of wages. If there is a portion of the legislative history that is clear, it is that Congress did not intend to permit comparable worth/under–valuation claims under the Equal Pay Act.[33]

Read in the light most favorable to Plaintiffs, Count II at best could be construed as setting forth an evidentiary basis for the allegations contained in proposed Count I. This claim is not, however, tantamount to sex–based wage discrimination in violation of either Title VII or the Equal Pay Act. *If* the under–valuation occurs as a result of intentional discrimination in formulating classifications of jobs, then that theory of liability is included in the claims of proposed Count I. However, I conclude that there is no independent cause of action based on a theory *solely* relating to comparable worth and under–valuation.

Plaintiffs in proposed Count II have not alleged, nor is it likely that they have any legal basis to allege, discrimination under this theory. Plaintiffs have merely alleged a comparable worth claim in the absence of an allegation of job segregation by sex.[34] Such an allegation is by necessity based on subjective evaluations of comparability among jobs. Further, Plaintiffs have not alleged an alternative theory of wage discrimination. Although comparable worth/under–valuation may be relevant evidence under a theory of discrimination, if proven, standing alone it will not establish a cause of action for sex–based discrimination. *See Gunther* at 1321.

If Plaintiffs had alleged intentional discrimination or an alternative theory of wage discrimination distinct from compara-ble worth, the outcome of the case would not depend on an evaluation of the relative worth of any two jobs. Rather, the challenge would be to the use of a wage structure that is built on the alleged intent that a job that is performed by women should be compensated at a reduced rate. It would then be the legality of this *system* that would be at issue.

In summary, Count II does not allege wage discrimination in violation of either Title VII or the Equal Pay Act but, rather, alleges that the failure properly to value Plaintiffs' work has resulted in Plaintiffs' loss of wages.

While the Court wholeheartedly concurs in the observation that the advancement of women and minorities will not be assured until employers pay all persons according to their value to the enterprise, it is my judgment that Congress has, thus far, seen fit to limit an employer's wage rate evaluations only by the preclusions against discrimination in wages and by the requirements of equal pay for objectively defined equal or substantially equal work. Thus, I cannot conclude at this point in time that Congress has authorized the courts to undertake an evaluation and determination of the relative worth of employees.

Accordingly, having concluded that amendment as to proposed Count II would be futile, *see* 3 Moore's Federal Practice ¶ 15.08[4], pp. 15–108—15–110, and that Count I does state a cognizable claim under Title VII, Plaintiffs' Motion for Leave to Amend Complaint is GRANTED as to Count I and DENIED as to Count II.

 The remaining issues concern Defendant's contentions of undue delay, prejudice, complication of issues, and other grounds presented for denial of leave to

---

**33.** So construed, it is unnecessary to resolve the issue as to whether the Bennett Amendment should be read to "authorize" certain procedures, as Plaintiffs suggest, or to permit any conduct not prohibited by the Equal Pay Act, as Defendant contends.

**34.** If the comparable worth claim of Plaintiffs in the instant case is based on a disparate treatment theory, a showing of intent would be crucial to the establishment of a prima facie

case of wage rate discrimination. At least one commentator has suggested that establishing job segregation should create an inference of wage discrimination sufficient to establish a prima facie case. *See* Blumrosen, *Wage Discrimination, Job Segregation, and Title VII of the Civil Rights Act of 1964*, 12 U.Mich.J.L.Ref. 399 (1979). However, to my knowledge, no court has yet adopted this view.

amend. As to the first three contentions, the Court would only note that Defendant's allegations fail to rise to the serious level of delay, prejudice, or complication of issues that would overcome the liberality with which the Court must view a motion to amend a complaint. *See Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The final issues that Defendant presents under its assertion that Plaintiffs' proposed amendments fail on their merits are that the proposed Second Amended Complaint is beyond the scope of the EEOC charges, investigation, determination, and conciliation and that proposed Count III is barred by the AT&T Consent Decree and the EEOC Opinion letters.

As to the contention that the proposed Second Amended Complaint is beyond the scope of the EEOC charges, Defendant asserts that Plaintiffs' claims in proposed Counts I, II, and III regarding, respectively, any position other than Field Assistant, the classification claims between clerical and craft, and claims regarding promotions and transfers, and the claim in Paragraph 62(b) of proposed Count IV, were never investigated, included in the letter of Determination or conciliated by the EEOC, and, thus, that this Court lacks jurisdiction regarding these issues. Plaintiffs respond by noting that the claims are of the same nature and like and related to the original claims in the EEOC proceedings and could have been reasonably expected to grow out of the EEOC investigation.

■ The Sixth Circuit decision in *Tipler v. E. I. duPont*, 443 F.2d 125 (1971), sets forth the test by which the scope of a judicial complaint in a Title VII action is delimited. In *Tipler* the court held that "the complaint in the judicial proceedings is only limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Id.*, at 131. Further, the claims in the judicial complaint must be like or related to the allegations contained in the EEOC charge. *Id.; see also Hannigan v. Aydin Corp.*, 76 F.R.D. 502, 506 (E.D.Pa.1977). Finally, that the jurisdictional prerequisites of Title VII are to be liberally construed in plaintiff's favor is well established. *See, e. g., McBride v. Delta Air Lines, Inc.*, 551 F.2d 113 (6th Cir. 1977).

■ Applying the dictates of *Tipler* to these circumstances, the Court finds that "the ambit of the . . . investigation that the [plaintiffs] complaint[s] might reasonably have been *expected* to stimulate" encompasses the classification claims, both generally and specifically, that Plaintiffs allege. *McBride v. Delta Air Lines, Inc., supra* at 115. Thus, in the instant case, the Court looks to the EEOC Determination which states, "Accordingly, we conclude that Respondent [Defendant] is maintaining sex-segregated job classifications in violation of Title VII." EEOC Determination at p. 2. As to Plaintiffs' inclusion of the job titles of positions other than Field Assistant, these positions are absorbed in the finding that the craft classification, contrasted to the clerical classification, was determined on the basis of sex.

Plaintiffs' promotional and transfer claims as between clerical and craft classifications are similarly related to the EEOC findings in that not only did the EEOC determine that Defendant maintained sex-segregated job classifications with the expected impediments within the classification that this segregation would foster but, additionally, the Defendant could be viewed as perpetuating the maintenance of this sex–segregated classification through the inter–classification promotion and transfer system. Finally, with respect to the scope of the investigation reasonably expected to grow out of the discrimination charges as to promotion, the Court notes that the EEOC Determination at p. 3 states, "males are routinely promoted from craft position into Plant Engineering without the necessity of prior supervisory experience." To the extent that contested Paragraph 62(b) is not covered by the foregoing finding, it is included in the effects of the sex–segregated classification system which is expressly noted above.

■ This Court believes that *Tipler* calls for a case–by–case analysis of the nature of the EEOC charges and the extent to which the alleged discrimination might be expected to pervade the employer's operations. Such a determination should reveal the scope of the EEOC investigation to be expected in response to the administrative charge of discrimination. To view the situation otherwise would contravene the broad remedial purpose of Title VII, penalize complainants who lack legal sophistication, and waste judicial resources. *See Hannigan v. Aydin, supra.* The Court is of the opinion that the liberal approach to the permissible scope of judicial complaints so as not to limit the judicial proceedings to only those claims specifically raised before the EEOC must be followed. Accordingly, the claims contained in the proposed Amended Complaint's Counts I, III, and IV will be allowed.

As to Defendant's assertion that proposed Count III is barred by the AT&T Consent Decree and the EEOC Opinion letters, Plaintiffs contend that Defendant has not implemented an Upgrade and Transfer Plan and that Defendant's employment decisions have not been made in conformity with such a plan. Additionally, Plaintiffs claim that there is a question of fact as to this issue and that it would be improper at this time to bar Plaintiffs' claim in reliance on Defendant's undeveloped contention that the Consent Decree serves as a complete insulation from attack.

■ Noting that Defendant's opposition to Count III is that it fails on its merits (*i. e.,* fails to state a claim upon which relief can be granted pursuant to F.R.Civ.P. 12(b)(6)) and that the Defendant raises matters outside the pleadings, the motion is treated as one for summary judgment and is disposed of as provided in F.R.Civ.P. 56. On a *motion for summary judgment,* all factual disputes are resolved against the moving party. Therefore, the Court must adopt the Plaintiffs' version of the facts and must construe the evidence in the light most favorable to the party opposing the motion and against the movant. *See Ad-*

*ickes v. S. H. Kress and Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425 (6th Cir. 1962). From this perspective, the Court cannot accept Defendant's position on the effect of the Consent Decree as to Count III in light of the Plaintiffs' allegations. While this issue may lend itself to resolution at a later time in these proceedings by the renewal and expansion of Defendant's assertions as to the effect of the Consent Decree, the Court at this time simply is not in a position to determine that there is no genuine issue of material fact contained within the allegations of Count III in terms of the Consent Decree. In summary the Court recognizes that the function of a motion for summary judgment is not to call upon the court to decide issues of fact but to determine whether there is an issue of fact to be tried on Plaintiffs' claims that Defendant has not implemented nor made employment decisions in conformity with a Model Program. *See Aetna Insurance Co. v. Cooper, Wells & Co.,* 234 F.2d 342 (6th Cir. 1956). Thus, Plaintiffs' claims in proposed Count III must be allowed.

As a final observation, the Court wishes expressly to acknowledge the extraordinarily capable presentation by respective counsel and to thank them for their patience and continued assistance throughout the prolonged resolution of this complex matter.

For the reasons stated, Plaintiffs' Motion for Leave to File Amended Complaint is GRANTED as to proposed Counts I, III, and that portion of proposed Count IV (Paragraph 62(b)) to which Defendant did not stipulate and is DENIED as to proposed Count II.

IT IS SO ORDERED.